UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TEOFILO REYES,

                              Petitioner,

                    -v.-

GRAHAM D. HAROLD,

                              Respondent.

---

17 Civ. 2881 (KPF) (DF)

**OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION**

KATHERINE POLK FAILLA, District Judge:

*Pro se* petitioner Teofilo Reyes brought a petition pursuant to 28 U.S.C.
§ 2254 (the "Petition" (Dkt. #2)), seeking to vacate several New York State
criminal convictions on the grounds of ineffective assistance by his trial and
appellate counsel.  Now pending before this Court is the February 4, 2022
Report and Recommendation issued by United States Magistrate Debra
Freeman (the "Report" (Dkt. #25), copy attached), which recommends that the
Petition be dismissed in its entirety.  The Court has examined the Report and
notes that no party has objected within the fourteen-day period from its
service, as provided by 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal
Rules of Civil Procedure.  For the reasons set forth below, the Court finds no
error in the Report and adopts it in full.

By way of background, Petitioner filed the Petition on April 13, 2017
(Dkt. #1), and on May 3, 2017, then-Chief Judge Colleen McMahon directed
Petitioner to complete a declaration concerning the timeliness of the Petition
(Dkt. #4).  After Petitioner submitted his declaration (Dkt. #5), the case was
assigned to the undersigned and Respondent was ordered to answer (Dkt. #8).

Respondent filed his response on December 15, 2017 (Dkt. #15-20), and

Petitioner filed his reply on January 18, 2018 (Dkt. #21).  This Court referred

the matter to Judge Freeman for a report and recommendation on June 5,

2017 (Dkt. #5), and Judge Freeman issued the Report on February 4, 2022

(Dkt. #25).  The Report itself is 59 pages long, and includes detailed summaries

of both the underlying offense conduct and Petitioner's prosecution, including

his many post-conviction applications for relief.  (Report 2-38).  The deadline

for the parties to file objections to the report was February 18, 2022.  (*See id.* at

58-59).  To date, no objections have been filed.

## DISCUSSION

A court may accept, reject, or modify, in whole or in part, the findings or

recommendations made by a magistrate judge.  *See* 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72(b); *Grassia* v. *Scully*, 892 F.2d 16, 19 (2d Cir. 1989).  A court may

also accept those portions of a report to which no specific, written objection is

made, as long as the factual and legal bases supporting the findings are not

clearly erroneous.  *See Ramirez* v. *United States*, 898 F. Supp. 2d 659, 663

(S.D.N.Y. 2012) (citation omitted).  A magistrate judge's decision is clearly

erroneous only if the district court is "left with the definite and firm conviction

that a mistake has been committed."  *Easley* v. *Cromartie*, 532 U.S. 234, 242

(2001) (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

"A party's failure to object to a report and recommendation, after receiving clear

notice of the consequences of such a failure, operates as a waiver of the party's

right both to object to the report and recommendation and to obtain appellate

2

review." *Grady* v. *Conway,* No. 11 Civ. 7277 (KPF) (FM), 2015 WL 5008463, at *3 (S.D.N.Y. Aug. 24, 2015) (citing *Frank* v. *Johnson,* 968 F.2d 298, 300 (2d Cir. 1992)).

As neither party has submitted objections to the Report, review for clear error is appropriate. *See Phillips* v. *Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013). The Court has reviewed the Report and finds that its reasoning is sound and that it is grounded in fact and in law. More specifically, the Court agrees with Judge Freeman's careful analysis of the legal issues raised by Petitioner, and with her ultimate conclusions that Petitioner received the effective assistance of counsel both at the trial level and at the appellate level. (Report 48-58). Having reviewed the record, the Court finds no clear error and adopts the Report in its entirety.

## CONCLUSION

The Court agrees completely with Judge Freeman's well-reasoned Report and hereby adopts its reasoning by reference. Accordingly, it is ordered that the Petition be dismissed in its entirety.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case. The Clerk of Court is further directed to mail a copy of this Opinion and Order to Petitioner at his address of record.

SO ORDERED.

Dated:   March 22, 2022
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEOFILO REYES, | 17cv2881 (KPF) (DF) |
| Petitioner, | |
| -against- | **REPORT AND RECOMMENDATION** |
| GRAHAM D. HAROLD, | |
| Respondent. | |

**TO THE HONORABLE KATHERINE POLK FAILLA, U.S.D.J.:**

Proceeding *pro se*, petitioner Teofilo Reyes ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, following his conviction by a jury of three counts of burglary in the second degree (Penal Law § 140.25[2]), two counts of possession of burglar's tools (Penal Law § 140.35), and one count of criminal possession of stolen property in the fifth degree (Penal Law § 165.40). (*See* Petition under 28 U.S.C. 2254 for Writ of Habeas Corpus by a Person in State Custody, dated April 13, 2017 ("Petition" or "Pet.") (Dkt. 2).) For these crimes, Petitioner was sentenced, as a persistent violent felon, to an aggregate prison term of 16 years to life. Petitioner is currently incarcerated at the Downstate Correctional Facility ("Downstate") in Fishkill, New York. In his Petition, Petitioner asserts the following claims: (1) that trial counsel was ineffective for failing (a) to investigate and prepare a defense, (b) to inform the court that petitioner had "fired" him, (c) to raise with the court an issue of subject matter jurisdiction, (d) to object to evidence introduced at a suppression hearing, and (e) to challenge introduction of petitioner's prior convictions; and (2) that appellate counsel was ineffective for failing to raise, on direct appeal, a claim regarding the trial court's response to a juror's question. (Pet., at 6-11.)

In opposition, respondent Graham D. Harold ("Respondent")[1] argues that Petitioner

received the effective assistance of both trial and appellate counsel.  (*See* Memorandum of Law

in Opposition to Petition for a Writ of Habeas Corpus, dated Dec. 15, 2017 ("Resp. Mem.")

(Dkt. 15).)

     For the reasons discussed below, I recommend that the Petition be dismissed in its

entirety.

## BACKGROUND

### A.    Factual Background

     The facts summarized herein are taken from the evidence at Petitioner's trial, which was

conducted on October 31, 2011.[2]

#### 1.    The Khandewal Burglary

     In the afternoon of April 6, 2010, Dennis O'Sullivan ("O'Sullivan"), associate director of

investigations at Columbia University, was driving around the area near Columbia.  (Trial Tr., at

326, 328-29.)  As he was driving, O'Sullivan saw a man, later identified as Petitioner, on the

corner of 122nd Street and Morningside Drive, talking on a cell phone and looking back behind

him.  (*Id.*, at 329-30.)  O'Sullivan watched as Petitioner hailed a taxi, walked a "short distance"

---

[1] At the time when Petitioner commenced this action, he was incarcerated at Auburn Correctional Facility, in Auburn New York, and, at that time, he properly named Graham D. Harold, the then-Superintendent of that facility, as Respondent.  Subsequently, Petitioner notified the Court that he had been transferred to Downstate.

[2] The transcripts of the state court proceedings in this case have been submitted by Respondent at Dkts. 17 and 18.  The transcript from the pre-trial suppression hearings can be found at Dkt. 17, from ECF 4-117 (referring to the page numbers affixed to the filing by this Court's Electronic Case Filing ("ECF") system), and will be referred to herein as "Pretrial Tr." The transcript from the trial, including Defendant's *Sandoval* hearing, begins at Dkt. 17, ECF 118, and continues through Dkt. 18, ECF 175, and will be referred to herein as "Trial Tr." The transcript from Defendant's sentencing can be found at Dkt 18, at ECF 176-225 and will be referred to herein as "Sentencing Tr."

away, and returned carrying a "large object" that appeared to be a large TV, "covered with a multi-colored blanket." (*Id.*, at 330.) Petitioner "threw a backpack into the back seat" and then struggled to place the "large object" into the taxi as well, eventually succeeding and riding off in the taxi. (*Id.*, at 331.)

O'Sullivan followed the taxi to West 135th Street, where Petitioner got out. (*Id.*, at 332.) Another man approached Petitioner and the two had a conversation. (*Id.*) This second person "helped [Petitioner] take the TV out of the rear seat of the [taxi]," and they carried the TV into a building at 535 West 135th Street. (*Id.*, at 332-33.) O'Sullivan was able to clearly observe Petitioner's face, and he described Petitioner as a "male Hispanic I would say in the forties. I would say maybe about 5'6" to 5'7". Medium build. Very short haircut. Clean shaven." (*Id.*, at 332-33.) O'Sullivan waited outside of the building to see if Petitioner would come back out, and, when he did not, O'Sullivan drove to the 26th Precinct. (*Id.*, at 333-34.) When O'Sullivan arrived at the Precinct, he spoke with New York Police Department ("NYPD") Detective Rojas ("Rojas") and gave Rojas a description of the man that he had seen. (*Id.*, at 334.)

At around 7:00 p.m. that evening, Amit Khandewal ("Khandewal") returned to his apartment at 110 Morningside Drive after work to find several of his belongings missing, including his television, multi-colored rug, bike, DVD player, and a suitcase with electronics in it. (*Id.*, at 294, 297-98.) Khandewal called the police, who came to investigate. (*Id.*, at 298.) While there, the police took pictures, and Office Favis Winston ("Winston") was able to obtain latent fingerprints from DVD boxes found in the apartment. (*Id.*, at 283-85, 299.)

The next day, on April 7, 2010, O'Sullivan, together with James Verdicchio ("Verdicchio"), then-director of investigations at Columbia University, reviewed security camera footage taken from 110 Morningside Drive on April 6, 2010. (*Id.*, at 258-61, 335.) O'Sullivan

3

and Verdicchio observed Petitioner enter the building behind another person and then leave

several minutes later, carrying "the large object underneath this multi-colored blanket." (*Id.*, at

335-36.)  O'Sullivan recognized Petitioner as the same person he had seen the day before at

122nd Street and Amsterdam Avenue. (*Id.*, at 336-37.)  O'Sullivan and Verdicchio then saw

Petitioner return to the building later in the day, this time with a key to the front door. (*Id.*,

at 337.)  After a period of time, Petitioner left with a bicycle. (*Id.*, at 337.)  Verdicchio isolated

portions of the security footage that showed Petitioner entering and leaving the building. (*Id.*, at

263, 338.)  On April 8, 2010, O'Sullivan gave Rojas the footage along with still images from the

video depicting Petitioner. (*Id.*, at 371-72.)  Rojas used the still images to create a "wanted"

poster, which was then distributed around the 26th Precinct. (*Id.*, at 372-73.)[3]

### 2. The Linn Burglary

On April 9, 2010, O'Sullivan was again conducting surveillance around Columbia

University. (*Id.*, at 339.)  While on surveillance, O'Sullivan saw Petitioner walk in front of his

car carrying a large blue duffel bag. (*Id.*, at 340.)  O'Sullivan used a police radio to contact the

26th Precinct to let them know he was following the person he believed to be "the burglar from

three days prior." (*Id.*, at 341.)  NYPD Officers Torturo ("Torturo") and Rosaly ("Rosaly")

drove to meet O'Sullivan at 123rd Street and Broadway, where O'Sullivan pointed towards

Petitioner. (*Id.*, at 342.)  Torturo and Rosaly stopped Petitioner, and O'Sullivan got out of his car

to go speak with them. (*Id.*, at 342.)  O'Sullivan explained that he had seen Petitioner three days

earlier carrying a large object which he believed to be a TV under a multi-colored blanket. (*Id.*,

---

[3] After Petitioner's eventual arrest, Norma Moody ("Moody"), associate fingerprint
technician with the NYPD, compared fingerprints recovered from Khandewal's apartment with
Petitioner's prints and found that they were a match. (*Id.*, at 391-92.)

at 342.)  Rosaly frisked Petitioner and recovered a large drill bit from Petitioner's rear pants

pocket.  (*Id.*, at 312-13.)

Rojas had also heard O'Sullivan's radio transmission and drove to the location where

Torturo, Rosaly, and O'Sullivan had stopped Petitioner.  (*Id.*, at 374.)  Petitioner, who identified

himself as Teofilo Reyes, was placed under arrest and brought to the precinct.  (*Id.*, at 374-75.)

At the station, Torturo searched Petitioner and recovered a set of lock picks from Petitioner's

sleeve.  (*Id.*, at 314-15.)  Petitioner was fingerprinted and Rojas took "inventory" of the property

recovered from Petitioner.  (*Id.*, at 375-76.)  In addition to the lock picks and drill bit, the duffel

bag that Petitioner had been carrying had several items inside.  (*Id.*, at 378.)  That same

afternoon, Gregory Linn ("Linn"), a high school chemistry teacher, called the police to report a

burglary in his apartment.  (*Id.*, at 244-45.)  Linn went to the Precinct, where he identified the

duffel bag that Petitioner had been carrying, along with the items inside of it, as his own.  (*Id.*, at

245-47.)  Included among the items missing from Linn's apartment, and found in the blue duffel

bag, were clothing, a bottle of wine, cameras, remote controls, a cell phone, a laptop computer,

keys, and a nail clipper.  (*Id.*, at 246-48.)

### B.    Procedural History

Petitioner was charged by grand jury indictment with three counts of Burglary in the

Second Degree, two counts of Possession of Burglar's Tools, and one count of Criminal

Possession of Stolen Property.  (*See* SR 51-52.)[4]

---

[4] Apart from the submitted transcripts, the State Court record in this case has been
submitted at Dkts. 19, 19-1, 19-2, 19-3, 19-4, and 19-5, and bears consecutively stamped page
numbers, marked in the form "SR___."  The Court will refer to those page numbers when citing
to materials contained in this portion of the record.  The State Court record includes the parties'
submissions in connection with:  (1) Petitioner's direct appeal; (2) Petitioner's first state *coram
nobis* petition; (3) Petitioner's motion to set aside his sentence, pursuant to N.Y. C.P.L. § 440.20;

1.   **Pretrial Proceedings**

On October 5, 2011, a pretrial *Mapp/Wade/Huntley* hearing[5] was held before the

Honorable Michael Sonberg, J.S.C., in the Supreme Court of New York, New York County.

(*See* Pretrial Tr.)  On October 28, 2011, a *Sandoval* hearing[6] was held before the Honorable

Roger Hayes, J.S.C., in the Supreme Court of New York, New York County.  (*See* Trial Tr., at

3-24.)

a.   **Petitioner's Requests for a New Attorney**

At the start of the *Mapp/Wade/Huntley* Hearing, Petitioner told Justice Sonberg that he

wanted a new attorney.  (Pretrial Tr., at 2-3.)  Justice Sonberg replied that he understood that

Petitioner had asked "Judge Allen for a new lawyer this morning and he said no,"[7] but allowed

Petitioner to "make [the] record" regarding the issues he claimed to be having.  (*Id.*, at 3.)

---

(4) Petitioner's motion to vacate the judgment against him, pursuant to N.Y. C.P.L. § 44.10; and
(5) Petitioner's second *coram nobis* petition, as well as the courts' decisions on those motions.

[5] This hearing was held pursuant to:  (1) *Mapp v. Ohio*, 367 U.S. 643 (1961), to
determine whether physical evidence sought to be used against Petitioner was obtained illegally;
(2) *United States v. Wade*, 388 U.S. 218 (1967), to determine whether Petitioner's pretrial
identification was the result of impermissibly suggestive procedures; and (3) *People v. Huntley*,
15 N.Y.2d 72 (1965), to determine whether any statements made by Petitioner should be
suppressed.

[6] This hearing was held pursuant to pursuant to *People v. Sandoval v.* 34 N.Y.2d 371
(1974), to determine whether evidence of Petitioner's criminal record would be admissible at
trial, if he chose to testify.

[7] The transcript submitted at Dkt. 17 contains three pages from a calendar call that
appeared to proceed before the Honorable Bruce Allen, J.S.C., on October 5, 2011.  (Dkt. 17, at
ECF 1-3.)  The transcript does not reflect the referenced discussion between Justice Allen and
Petitioner.

Petitioner explained that he suffered from "disturbed emotion" and that his appointed

attorney, Steven Fusfeld, Esq. ("Fusfeld"), "want[ed] to bring on a strategy to the trial that

[Petitioner] [did not] want him to." (*Id.*) Justice Sonberg explained that it is the attorney's job,

and not Petitioner's right, to decide trial strategy, and that Petitioner was "incredibly fortunate to

have Mr. Fusfeld as [his] lawyer." (*Id.*, at 4-5.) Petitioner nevertheless insisted that his rights

were being violated by his not being appointed a new attorney. (*Id.*, at 5.) He stated that there

was a "conflict of interest" between him and Fusfeld (although he did not elaborate on what that

conflict was) (*id.*, at 6); that the sentence he was facing was "a sentence for someone who has

killed someone" and that he did not kill anyone (*id.*, at 10); that he had "a defense" (*id.*, at 16);

and that Fusfeld had "to do things the way [Petitioner] want[ed] to because [Fusfeld] [was] the

attorney who [was] representing [him]" (*id.*). Petitioner stated that Fusfeld "[did not] even have

a defense" and had "never even talked to" him. (*Id.*, at 17.) Fusfeld interjected at that point to

clarify that he had, in fact, had conversations with Petitioner, although there had been times

when Petitioner had refused to speak with him. (*Id.*, at 19-20.) Justice Sonberg denied

Petitioner's request for a new attorney (*id.*, at 26), noting that no attorney could permit his client

to decide trial strategy (*id.*, at 19) and that Fusfeld was now Petitioner's third lawyer (*id.*, at 28).

Throughout this discussion, Petitioner repeatedly made exclamations like: "[t]hat's it[,]

kill me[,] that's all you have to do" (*id.*, at 13); "I am going to kill myself" (*id.*, at 17); "[m]y

rights have been violated . . . I have a right to change my attorney" (*id.*, at 17-18); "[t]his is an

abuse . . . I am being ambushed with policem[e]n here. . . why don't they draw their guns and

shoot me so they can give me the 12 bullets that they are supposed to give me" (*id.*, at 21); and

"[y]ou want me to die" (*id.*, at 26). After these interjections by Petitioner, Justice Sonberg

adjourned for lunch and told Petitioner that he would either have to sit quietly for the hearing or

would be excluded from the courtroom.  (*Id.*, at 30.)  After lunch, a court officer tried to get

Petitioner to come back to the courtroom, but Petitioner refused to do so.  (*Id.*, at 31.)

Justice Sonberg then asked Fusfeld to see if he could get Petitioner to come to the courtroom.

(*Id.*, at 31-32).  Fusfeld attempted to speak to Petitioner, but Petitioner would not speak with

him.  (*Id.*, at 32.)  At that point, Justice Sonberg made a finding that Petitioner had "wil[l]fully

refused to come into court" and that the hearing would proceed without him.  (*Id.*)

**b.**   ***Mapp/Wade/Huntley* Hearing**

At the *Mapp/ Wade/Huntley* hearing, Petitioner, through counsel, moved to suppress

statements allegedly made by him, property alleged to have been recovered from him, and

O'Sullivan's identification of him.  (*See* Pretrial Tr.)

Officer Torturo and Detective Rojas testified at the hearing.  (*Id.*, at 35-103.)  Torturo

testified first, and gave the following account of the circumstances of Petitioner's arrest:

On the morning of April 9, 2010, Torturo and his partner, Rosaly, attended a meeting at the

26th Precinct, where they were informed about a burglary pattern around Columbia University

and were given a wanted poster with a suspect's description and photograph.  (*Id.*, at 37.)  At

around 1:45 p.m. that afternoon, O'Sullivan's call came over the police radio, stating that he was

following a person suspected of burglaries near Columbia University.  (*Id.*, at 38-39.)  Torturo

and Rosaly were nearby and immediately drove to O'Sullivan's location at West 123rd Street

and Broadway.  (*Id.*, at 39.)  When they arrived, O'Sullivan pointed to Petitioner, and Torturo

and Rosaly proceeded to stop him.  (*Id.*, at 40.)  They stopped their police vehicle, stepped out of

the car, and asked Petitioner to stop and place the duffel bag he was carrying on the ground.  (*Id.*)

Petitioner complied, and O'Sullivan approached and told Torturo and Rosaly that Petitioner was

the same individual who had previously been suspected of committing burglaries at Columbia

8

University.  (*Id.*, at 40-41.)  Torturo also recognized Petitioner as the individual pictured in the wanted poster he had seen that morning.  (*Id.*, at 41.)  Without handcuffing Petitioner, Rosaly conducted a frisk and recovered a "large drill bit" from Petitioner's "rear pants pocket on the right side."  (*Id.*, at 41-42.)  Another officer who had arrived on the scene, Detective Borst ("Borst"), looked into the duffel bag "briefly to make sure that there were no dangerous instruments in the bag that could hurt [them] at the time," but he did not empty out the bag, nor did he reach into the bag or dig through its contents at that point.  (*Id.*, at 42.)  Torturo and Rosaly placed Petitioner under arrest and brought him back to the 26th Precinct.  (*Id.*, at 43.) Back at the precinct, Torturo conducted a "full search for weapons and contraband" and recovered two lockpicks from Petitioner's jacket sleeve.  (*Id.*, at 43-44.)

Rojas gave a similar account, but also testified to having viewed video surveillance footage that showed Petitioner's activities and that led Rojas to create the wanted poster that Torturo had seen.  Specifically, Rojas testified as follows:  On April 6, 2010, Rojas spoke with O'Sullivan, who told him that, on that day, O'Sullivan had observed a man acting suspiciously and carrying what appeared to be a big flat-screen TV with a multi-colored blanket covering it. (*Id.*, at 64-65.)  Later that day, police received a report of a burglary from a location a block away from where O'Sullivan had seen the man.  (*Id.*, at 65.)  Among the items reported missing were a big flat-screen TV and a multicolored comforter.  (*Id.*, at 66.)  Rojas obtained video surveillance from Columbia University of the building at 110 Morningside Drive and reviewed the footage with O'Sullivan.  (*Id.*, at 67.)  On the video, he saw Petitioner enter the building and come back out with a TV covered in a blanket.  (*Id.*, at 67-68.)  Then Rojas observed Petitioner use a key to enter the building again, a few hours later, and exit a few minutes after that, with a

bicycle and some luggage.  (*Id.*, at 68.)  Rojas also downloaded still photographs from the video

and placed them on a wanted poster.  (*Id.*)

As to the events on the date of Petitioner's arrest, Rojas testified that, on April 9, 2010,

he overheard a radio run being transmitted of a person stopped around 122nd Street and

Broadway and proceeded to that location.  (*Id.*, at 71.)  When he arrived, he saw Torturo, Rosaly,

and O'Sullivan, along with a man whom he recognized as the person on the wanted poster.  (*Id.*,

at 71-72.)  According to Rojas, O'Sullivan similarly indicated that this man was the same person

as was depicted on the wanted poster and was seen on the video surveillance.  (*Id.*, at 72.)  The

man identified himself as Teofilo Reyes, and he was arrested and brought back to the precinct.

(*Id.*)  Officers Torturo and Rosaly gave Rojas the duffel bag that Petitioner had been carrying,

along with a drill bit and lockpicks.  (*Id.*, at 73.)  Once back at the Precinct, Rojas conducted an

inventory search of the duffel bag and made a list of everything inside the bag.  (*Id.*, at 75.)

Finally, Rojas testified that he had attempted to speak with Petitioner at approximately

4:20 p.m. that afternoon.  (*Id.*, at 80.)  According to Rojas, he introduced himself and told

Petitioner that he was investigating a few burglaries and had already seen Petitioner on video.

(*Id.*, at 81.)  Rojas testified that, "[a]t that time, [Petitioner] became irate," and "said that all the

stuff in the bag was his, that he bought it on his way up from 42nd Street and he wanted to speak

to his lawyer."  (*Id.*)  When Rojas was asked if he ever read Petitioner his *Miranda* rights, Rojas

responded that he never got the chance because, once Petitioner said he needed a lawyer, Rojas

got up and left the room.  (*Id.*, at 82.)

Fusfeld chose to rest on the record of the evidentiary hearing (*id.*, at 103), and the

prosecutor, Ann Schwartz ("Schwartz"), gave a brief closing argument (*id.*, at 103-04).

Schwartz argued that there was no police-arranged identification in this case, as O'Sullivan had

seen Petitioner on the street, recognized him on video footage received from 110 Morningside

Drive, and then recognized him again on April 9, at which time O'Sullivan pointed Petitioner out

to Officers Torturo and Rosaly.  (*Id.*, at 103-04.)  She further argued that the duffel bag

Petitioner had been carrying was searched pursuant to "appropriate police guidelines," and that

there was no attempt to take any statement from Petitioner once he stated that he wanted an

attorney.  (*Id.*, at 104.)

      Justice Sonberg found that the identification of "the defendant as the suspect . . . was not

a police-arranged identification." (*Id.*, at 111.)  Although O'Sullivan had not, himself, testified

at the hearing, the court still emphasized that there was evidence that O'Sullivan had observed

Petitioner "in the flesh with the flat screen TV covered with a multicolored comforter," that these

items were later confirmed to be "the proceeds of a burglary," and that O'Sullivan had confirmed

this by viewing Petitioner on the surveillance footage.  (*Id.*, at 111-12.)  The court concluded that

"there [were] no constitutional issues implicated by [Petitioner's] arrest following

Mr. O'Sullivan's identification of the defendant."  (*Id.*, at 112.)

      Justice Sonberg next found that the property recovered from Petitioner was obtained

lawfully by the police and was therefore not subject to suppression.  (*Id.*, at 112-13.)

Specifically, the court found that the drill bit recovered from Petitioner was recovered "during a

protective frisk[,] merely a pat[]down in a situation where the defendant was the suspect in a

residential burglary and [where it] was appropriate for the officers to protect themselves to

[e]nsure there were no weapons on the defendant's person."  (*Id.*, at 112.)  The court further

found that the lock picks that were recovered from the Petitioner's jacket were recovered in a

search incident to arrest.  (*Id.*)[8]  As for the property inside the duffel bag, the court found that the inventory search was done "pursuant to written guidelines and performed in accordance with those guidelines," and therefore was not subject to suppression.  (*Id.*, at 113.)

Justice Sonberg also made rulings with regard to two statements that had been made by Petitioner following his arrest (*id.*), but Petitioner has not challenged those rulings in his habeas Petition.

### c.     *Sandoval* **Hearing**

At the outset of the *Sandoval* hearing, which, as noted above, was conducted before Justice Hayes, the court noted that Petitioner was not present, and Fusfeld explained that he had gone to speak with Petitioner that morning and asked if he intended to come to court, and Petitioner had responded that Fusfeld was not his lawyer and asked why Fusfeld was speaking to him.  (Trial Tr., at 2.)  Justice Hayes stated that court officers had gone to inform Petitioner "that he ha[d] a chance to come up."  (*Id.*, at 3.)  Justice Hayes further stated, "It seems to me [] based on the record so far that number one, you are his counsel. . . .  You've gone down and talked to him.  I know how thorough your preparation is, having tried other matters with you."  (*Id.*)  Justice Hayes continued, "As we said yesterday, [Petitioner] . . . has been found fit.  I know there was some concern that he was going to hit his head or was hitting his head on the walls.  I take it from the fact that you spoke to him yesterday and today, [that there are] no apparent injuries."  (*Id.*)  After Fusfeld confirmed that Petitioner did not have any apparent injuries (*id.*), the court stated:

---

[8] Although Justice Sonberg actually referred to "drill bits" having been recovered from the Petitioner's jacket (Pretrial Tr., at 112), this Court assumes that he meant lock picks, as the evidence presented at the hearing reflected that the drill bit was recovered from Petitioner's pants pocket, while lock picks were recovered from Petitioner's jacket in a search incident to arrest.

> It seems to me based on the discussions that you have had, that
> he's fit.  I have certainly not seen anything or heard anything that
> would make me question it in view of the reports of both mental
> health examinations.[9]  Also that if he doesn't come, he's
> knowingly, intelligently, voluntarily waived or forfeited his right to
> be present.  I think to have force used on him . . . while I have no
> doubt he could be physically brought into the courtroom, to have to
> consider gagging him, security measures, that's just
> unnecessary . . . if he refuses to come, that's his own knowing,
> voluntary and intelligent choice.

(*Id.*, at 4.)  Fusfeld responded that, if Petitioner wanted a new lawyer, then "maybe he should

have a new lawyer," but that he was not going to make the same argument each day, and that he

knew the situation had already been addressed by both Justices Allen and Sonberg.  (*Id.*, at 5.)

The court stated that the prosecution had already made arrangements with their witnesses.  (*Id.*)

At that point, the court officers returned without Petitioner, and the court clerk reported

that Petitioner wanted to talk to his attorney.  (*See id.*)  Justice Hayes stated,

> Here's [what] we are going to do.  We are going to do a *Sandoval*.
> What I will do is I will prepare a letter that will inform [Petitioner]
> that you are his attorney.  That no changes will be made.  No
> changes will be considered unless he comes to court.  Does that
> sound sensible?

(*Id.*, at 5-6.)  Both Fusfeld and Schwartz (the prosecutor) agreed.  (*See id.*, at 6.)  Justice Hayes

then stated that the court had "made the findings that [Petitioner] ha[d] waived or forfeited his

right to be here by his not agreeing to come up," and the court proceeded with the *Sandoval*

hearing, asking Schwartz what matters she would inquire about, should Petitioner choose to

testify at trial.  (*See id.*)  Schwartz explained that, if Petitioner were to take the stand, she would

ask whether he was currently on parole and whether a conviction in the instant case would be a

---

[9] Throughout the proceedings, various references are made to evaluations that Petitioner
underwent to determine whether he was fit to stand trial, but there are no reports of such
evaluations in the state record.

violation of his parole.  (*Id.*, at 6-7.)  Schwartz also stated that she would also ask Petitioner

about his prior convictions, which included a felony burglary conviction in 2002 (*id.*, at 7), a

misdemeanor trespass conviction in 1998 (*id.*, at 8-9), a felony burglary and assault conviction in

1994 (*id.*, at 9), and a felony conviction for attempted sale of a controlled substance in 1990 (*id.*,

at 10).

Fusfeld argued that testimony about Petitioner's being on parole, or about Petitioner's

prior bad acts or convictions, would be unduly prejudicial.  (*Id.*, at 12-13.)  Fusfeld requested

that any testimony about prior bad acts be limited to a discussion of the fact that Petitioner had a

criminal record, without any inquiry into specifics of those crimes.  (*Id.*, at 13.)

Justice Hayes ruled that any testimony about Petitioner's being on parole would be "very

prejudicial" and that Schwartz therefore could not question Petitioner on that subject.  (*Id.*,

at 15.)  Justice Hayes further ruled that Schwartz could ask Petitioner if he had previously been

convicted of any crimes, and could name the crimes and the dates, but could not ask about the

details of such crimes.  (*Id.*)

### 2. <u>Trial</u>

Petitioner was tried by a jury, before Justice Hayes, on three counts of burglary in the

second degree, under N.Y. Penal Law § 140.25(2); two counts of possession of burglar's tools,

under N.Y. Penal Law § 140.35; and one count of criminal possession of stolen property in the

fifth degree, under Penal Law § 165.40.  Each morning, as the trial progressed, either Fusfeld or

a court officer attempted to get Petitioner to come to court, and each morning Petitioner refused.

(*See generally* Trial Tr.)  The court heard testimony from the Columbia University employees

who participated in the investigation (O'Sullivan (*id.*, at 326) and Verdicchio (*id.*, at 257)); two

NYPD officers who were involved in Petitioner's identification and arrest (specifically, Torturo

(*id.*, at 306), and Rojas (*id.*, at 369)); members of the NYPD who were involved in obtaining and analyzing the fingerprint evidence (Winston (*id.*, at 277) and Moody (*id.*, at 385)); and both of the burglary victims (Linn (*id.*, at 241) and Khandelwal (*id.*, at 293)).

Petitioner did not testify at trial, and Fusfeld did not call any other witnesses to testify on Petitioner's behalf, but he made an opening statement, cross examined each witness presented by the prosecution, and presented a closing argument.  (*See id.*)  At the close of the evidence, Fusfeld moved to dismiss all charges, on the grounds that the prosecution had not presented sufficient evidence (*id.*, at 402), but that motion was denied by the court (*id.*).

### 3.     Juror Question

Justice Hayes charged the jury on November 4, 2011, and, as the jury was deliberating, they had several questions for the court (*id.*, at 465-75), one of which – regarding the possession of stolen property charge – is at issue here.  As background, the court had called the jurors back into the courtroom because they had asked to see certain photos of Petitioner that were only available in electronic form and therefore could not be sent to the jury room.  (*Id.*, at 467.)  When the jury had finished viewing the image, Justice Hayes stated, "[i]f everybody has seen what they want to, you can go back and continue to deliberate."  (*Id.*, at 470.)

At that point, a juror asked, in open court, "What do you mean by in the fifth degree?" (*id.*)  Without first conferring with counsel, Justice Hayes replied:

> The degree is simply the name that's given to that particular charge.  The fact that it's the fifth degree distinguishes it from another charge.  In other words – let's take something that has nothing to do with this case.  Suppose the charge were murder. That crime murder has different degrees, depending on what the People have to prove beyond a reasonable doubt.  So to distinguish different degrees covered by the same basic section, the law just says this is murder one, murder two, murder three, murder four, whatever it is.  Murder five.  That's all it is.  It just distinguishes

this particular charge from a similar crime that has different elements.

(*Id.*, at 470-71.)   The court then asked both attorneys, "[i]s that fair?" to which they both replied, "Yes, Your Honor." (*Id.*, at 471.)   The jury then exited the courtroom, and the following colloquy occurred:

> The Court:   I realize, counsel, two things.  One, I probably should have said to Ms. Feldman, foreperson sent [sic] Ms. Feldman back inside and tell her to send us a note.  And secondly, I should have conferred with you before I responded to her question.  I guess I was just a little bit shocked that the jurors were on their way in and she threw that question out.  Is there anything, People, that you wish me to do?  Would you want a different explanation given to the jury?  I will bring them out again if you think any clarification or change is appropriate.
>
> Ms. Schwartz:   No, Your Honor.
>
> The Court:   Defense?
>
> Ms. Fusfeld:   No, Judge.
>
> The Court:   I honestly didn't think so, but I acted instinctively.  In the fullness of time, if you think there's something you want me [to] add or change, I'll think about it.

(*Id.*, at 471-72.)

### 4.   Verdict and Sentencing

Later in the afternoon on November 4, 2011, the jury delivered its verdict, finding Petitioner guilty of all charges.  (*Id.*, at 475-76.)

Petitioner was then sentenced on January 5, 2012, before Justice Hayes.  (*See* Sentencing Tr.)  Fusfeld raised Petitioner's psychiatric issues, stating, "there has been a long history with respect to [Petitioner's] [] psychiatric issues . . . . [Petitioner] does have a psychiatric issue, mental health issues, they have been documented by the Department of Corrections." (*Id.*, at 6.)

16

He continued, "After speaking to [Petitioner] . . .[,] he [] has indicated that he is consistently hearing voices that . . . are preventing him from understanding what is going on . . . ." (*Id.*) Fusfeld additionally stated:

> I don't believe [Petitioner] is in a position to understand what is going to happen or what is happening in the courtroom and for that reason, Judge, I don't believe he is fit to proceed with the remainder of the proceedings at the present time.  So for those reasons, Your Honor, I think it would be appropriate to [] request again, pursuant to Article 730, to assure either that he is fit to proceed . . . or if he is not fit because of these voices and other matters that he receive the appropriate treatment to take care of those needs . . . I am asking the court to order a 730 examination.[10]

(*Id.*, at 8.)  Schwartz responded that, each time Petitioner had been unhappy with something that happened during the course of the investigation and trial, he had claimed to be hearing voices. (*Id.*, at 8-9.)  She emphasized that an Article 730 examination had initially been conducted to determine whether Petitioner was fit to proceed, and that two doctors had found that Petitioner was fit for trial.  (*Id.*, at 9.)  She noted that Petitioner had another outburst "when we were about to get sent out for trial," and "a 730 was ordered and [another] two doctors found [Petitioner] fit."  (*Id.*)  She further noted that "the defense then hired an expert who examined [Petitioner,] . . . and the defense [chose] not to challenge the 730 finding of fitness."  (*Id.*)  Arguing that "[Petitioner] has essentially been examined five times and found fit" (*id.*), she concluded by contending that "this is the act that he puts on in order to stop the proceeding" (*id.*, at 12).

Justice Hayes then stated, "I believe that this is simply a reflection of [Petitioner's] desire not to face the consequences of his acts" (*id.*, at 19), and denied counsel's request for another Article 730 examination (*id.*, at 22).  Petitioner then again claimed to be hearing voices and

---

[10] Article 730 of the New York Criminal Procedure Law provides for evaluations of criminal defendants to determine whether they are fit to proceed.  *See generally* N.Y. C.P.L. Art. 730.

stated that he needed to use the restroom.  (*Id.*, at 24-25.)  Justice Hayes granted Petitioner's request to use the restroom, but emphasized that, should Petitioner refuse to return to the courtroom, the sentencing hearing would continue without him.  (*Id.*, at 25.)  After a court officer reported that Petitioner had in fact refused to come back to court, Justice Hayes found that Petitioner had "voluntarily, knowingly, and intelligently waived his right to participate in at least today's proceedings . . ." (*Id.*, at 29.)

The prosecutor then called Sebastian Rosado ("Rosado"), a fingerprint examiner with the NYPD.  (*Id.*, at 31-35.)  Rosado testified that Petitioner's fingerprints matched fingerprints taken in connection with an arrest made on August 28, 2001.  (*Id.*, at 34.)

Justice Hayes stated that Petitioner had previously been found to be a "second violent felon," and that Petitioner was therefore "a persistent violent felony offender."  (*Id.*, at 39.)  Schwartz asked the court for a sentence of 18 years to life, "concurrent on the [] burglary charges as well as a year each on the misdemeanors, concurrent again with any time."  (*Id.*, at 40-41.)  For his part, Fusfeld argued that Petitioner should receive the minimum sentence of 16 years to life "with the various counts running concurrently," and argued that that was a "significant sentence and more than sufficient to punish [Petitioner] for the crimes for which he was convicted."  (*Id.*, at 43.)

Justice Hayes ultimately sentenced Petitioner, as a "persistent violent felony offender," to prison terms of 16 years to life for each of the three counts of burglary in the second degree, and determinate sentences of one year for each of the two misdemeanor counts (possession of burglar's tools and possession of stolen property in the fifth degree), with the burglary sentences to run concurrently and the sentences for the misdemeanors to run "concurrently with each other and by law they merge into [Petitioner's] sentence on the felonies."  (*Id.*, at 48.)

### C.   Post-Trial Proceedings

#### 1.   Direct Appeal

Petitioner timely appealed his conviction to the Appellate Division, First Department, raising two claims:  (1) that the trial court's failure to inquire about, and ultimate denial of, Petitioner's request for new counsel violated his Sixth Amendment rights, and (2) that the prosecution had failed to demonstrate that there had been reasonable suspicion to stop and frisk Petitioner, and that "the fruits of the illegal police intrusion" should have been suppressed.  (*See* Brief for Defendant-Appellant, dated May 31, 2013 ("Pet. App. Mem.") (Dkt. 19), at SR 1-43.)

On the first of these claims, Petitioner argued that the trial court had an obligation to make a "minimal inquiry into the nature and magnitude of the conflict" between Petitioner and his attorney, Fusfeld, before denying Petitioner's request for new counsel.  (*See id.*, at SR 23-33.) Petitioner further argued that he had provided the trial court with a "legally adequate reason for potential substitution" when he said that he did not trust Fusfeld, that Fusfeld did not "even have a defense," and that Fusfeld had never talked to him.  (*Id.*, at SR 26.)  Petitioner conceded that "the court properly found that [disagreements between Petitioner and his counsel regarding trial strategy] were not grounds for substitution [of counsel]" (*id.*), but claimed that the trial court's denial of Petitioner's request on that basis alone was improper, as Petitioner had also asserted a "serious conflict" with his attorney (*id.*).  Once the trial court was alerted to the conflict, Petitioner argued, the court had an obligation to make some inquiry to determine whether substitution was warranted.  (*Id.*)

On the second claim, Petitioner asserted that the evidence presented at Petitioner's suppression hearings "failed to establish any basis of knowledge for the police informant's [*i.e.*, O'Sullivan's] accusations," and "failed to make out the requisite reasonable suspicion to justify

the stop and frisk of [Petitioner]."  (*Id.*, at SR 33.)  He argued that O'Sullivan did not explain to

Torturo "why he believed [Petitioner] was a suspect in a burglary – he merely said that he was

'following a person suspected for burglaries at Columbia,'" and pointed to Petitioner.  (*Id.*, at

SR 35 (quoting testimony of Officer Torturo (Pretrial Tr., at 39-40, 46)).)  O'Sullivan's

statement, Petitioner argued, was based on "mere rumor or suspicion," and did not meet the

requirement that, where probable cause is based on hearsay, "the police must establish that the

informant had some basis for the knowledge transmitted . . . and that he was reliable."  (*Id.*, at

SR 34 (quoting *People v. Bigelow*, 66 N.Y.2d 417, 423 (1985)).)  Petitioner maintained that the

officers frisked him "based only on Mr. O'Sullivan's assertions that this was a person wanted for

burglaries, without any basis of knowledge for why he believed so."  (*Id.*, at SR 37.)  Therefore,

Petitioner argued, the stop and frisk was not based on reasonable suspicion, such that "the fruits

of that illegality," namely the drill bit, the duffel bag, and the contents of the duffel bag, had to

be suppressed and the matter remanded for a new trial.  (*Id.*, at SR 41.)

The People opposed the appeal (*see* Brief for Respondent, dated October 2013 ("Resp.

App. Mem.") (Dkts. 19, 19-1), at SR 44-102), and argued (1) that the People had proven

Petitioner's guilt with overwhelming evidence (which was not contested by Petitioner on

appeal); (2) that Petitioner's claim that the police had engaged in an unlawful stop and frisk was

unpreserved and, in any event, without merit; and (3) that Justice Sonberg had properly denied

Petitioner's "blatantly dilatory" request for new counsel.  (*See generally id.*)

As to Petitioner's claim regarding the allegedly unlawful stop and frisk, the People

argued that Petitioner's "complaints [were] completely unpreserved."  (*Id.*, at SR 65; *see also id.*,

at SR 67 (arguing that "[t]he preservation requirement exists to encourage parties to draw a

court's attention to errors at a time when they might be corrected and review of unpreserved

claims is an 'extravagant protection to be exercised only in exceptional cases" (citing *People v. Udzinski*, 146 A.D.2d 245, 248 (2d Dept. 1989))).)[11]  The People also argued that the claim was meritless, as O'Sullivan himself had observed "the suspicious sight of a man carrying a television hidden beneath a blanket"; as later that same afternoon a report came in of a robbery at 110 Morningside Drive, just a block away from where O'Sullivan had seen the man; as, two days later, Rojas and O'Sullivan reviewed security footage that showed Petitioner carrying a television hidden beneath a multi-colored blanket from 110 Morningside Drive; and as, on following day, April 9, O'Sullivan himself saw Petitioner again and made a call on the police radio that he was following a burglary suspect.  (*Id.*, at SR 70-71.)

By decision dated December 10, 2013, the Appellate Division, First Department, unanimously affirmed Petitioner's conviction and sentence.  *See People v. Reyes*, 112 A.D.3d 465 (1st Dep't 2013) (copy included in the State Court Record at SR 103-06).  The Appellate Division held that the trial court had "properly exercised its discretion in denying [Petitioner's] request for assignment of new counsel, since [Petitioner] did not establish good cause for a substitution," (*id.*, at 465) and that Petitioner's "nonparticularized lack of confidence in his third assigned attorney did not warrant substitution" (*id.*).  The Appellate Division also held that Petitioner's "generalized argument that the police lacked probable cause for his arrest failed to preserve his present contentions" and the court "decline[d] to review them in the interest of justice."  (*Id.*)  "As an alternative holding," the court also "[found] that the police, who relied on a wanted poster, had reasonable suspicion that justified stopping and frisking [Petitioner], and

---

[11] In a footnote to their brief, the People added:  "[Petitioner] claims that, because he moved for suppression and the hearing court ruled on the motion, he has preserved his current arguments . . . but, it is axiomatic that, for a claim to have been preserved for appellate review, an objection at the trial level must have been 'specifically directed at the error being urged' on appeal."  (SR 66-67, n.4 (citing *People v. Hawkins*, 11 N.Y.3d 484, 492 (2008).)

that [Petitioner's] argument concerning the adequacy of an informant's basis of knowledge [was]

unavailing." (*Id.*, at 465-66.)

By letter dated December 11, 2013, Petitioner, through counsel, sought leave to appeal to

the New York Court of Appeals, attaching copies of the briefs filed in the Appellate Division,

and asking the Court of Appeals "to consider and review all issues" contained therein. (Letter to

the Honorable Jonathan Lippman from Rachel T. Goldberg, Esq., dated Dec. 11, 2013

(Dkt. 19-1), at SR 107-11.) On March 21, 2014, the Court of Appeals issued an Order denying

leave to appeal without opinion. *See People v. Reyes*, 22 N.Y.3d 1158 (2014) (copy included in

the State Court Record at SR 115).

### 2.    Petitioner's March 2015 *Coram Nobis* Application

On March 16, 2015, Petitioner filed a *pro se* motion in the Appellate Division, First

Department, for a writ of error *coram nobis*. (SR 116 (Notice of Motion); *see also* SR 117-29

(Affidavit in Support of Motion).)[12]  Petitioner argued that his appellate counsel had failed to

raise a particular claim on appeal – specifically, a claim that "the trial court responded to a juror

---

[12] This Court notes that, while the implication of Petitioner's recitation of his various
state motions is that this was his first *coram nobis* application (*see* Pet. ¶ 11(a)), and while the
earliest *coram nobis* motion in the State Court Record reflects the March 2015 date (*see*
SR 116-29), it appears that Petitioner may, in fact, have filed an earlier *coram nobis* petition, in
2014, which is not in the record. The document in the State Court Record at SR 142 – indicated
by Respondent to be the Appellate Division's decision on Petitioner's first *coram nobis*
application (*see* Resp. Mem., at 13) – is dated December 11, 2014, three months *before*
Petitioner's March 2015 motion was even filed (*see* SR 142). Further, the corresponding Order
of the Court of Appeals (denying leave to appeal) that is included in the State Court Record at
SR 146 is dated April 13, 2015, and appears, on its face, to be a denial of a request by Petitioner
to appeal the Appellate Division's December 11, 2014 Order. *See People v. Reyes*, 2015 N.Y.
LEXIS 1284, *1 (also available at SR 146). This Court concludes, however, that the seeming
absence from the record of an earlier *coram nobis* application is not material to this Court
recommendation on the pending habeas Petition, as, for the reasons discussed below, such an
application would affect neither this Court's statute-of-limitations analysis, nor its analysis
regarding the relevant issues of exhaustion and procedural bar.

in open court on a substantive request without requiring such request to be submitted in writing, without being marked as a court exhibit, and without notice to the People and the defense." (SR 117-18.)  Petitioner noted that a juror had asked for "the meaning of fifth degree," which, Petitioner argued, required a "substantive," rather than a "ministerial," response, such that the court's immediate response constituted a failure to comply with "its core responsibilities under C.P.L. § 310.30," requiring reversal.  (SR 118.)  Petitioner contended that, "[b]ut for appellate counsel's failure to raise this issue on appeal . . . a new trial would have been required . . . ." (SR 118-19.)

The People opposed Petitioner's motion on April 30, 2015[13] (SR 130-38), arguing that the juror's question was "ministerial or non-substantive," and that the court was therefore permitted to respond "without notifying, or seeking input from, defense counsel."  (SR 135.) According to the People, the question was ministerial because it "was unrelated to the elements on which the jurors had to deliberate and, thus, there [was] no way that the court's response could have affected deliberations" and the response "in no way impacted [Petitioner's] 'opportunity to defend against the charges.'"  (SR 136 (citing *People v. Hameed*, 88 N.Y.2d 232, 241 (1996)).)  The People further argued that, even if the juror's inquiry had been substantive, "there was still no preserved question of law to raise on appeal."  (*Id.*)

Petitioner submitted a reply on May 5, 2015, reiterating his earlier arguments. (SR 139-41.)

On June 25, 2015, the Appellate Division denied Petitioner's motion without opinion. *People v. Reyes*, 2015 N.Y. App. Div. LEXIS 9791, at *1 (1st Dep't June 25, 2015) (also

---

[13] The response is actually dated April 30, 2014, but given that Petitioner's *coram nobis* petition was filed in March of 2015, and the "Return Date" shown at the top of the response is May 4, 2015 (*see id.*), this Court assumes that 2014 was written in error.

available at SR 495).[14]  Petitioner sought leave to appeal to the New York Court of Appeals on

or about July 13, 2015 (SR 143), and the Court of Appeals denied leave to appeal on

November 17, 2015, *see People v. Reyes*, 26 N.Y.3d 1042 (2015).

### 3.      Petitioner's May 2015 *Coram Nobis* Application

Petitioner filed another *pro se coram nobis* motion with the Appellate Division, First

Department, on or about May 28, 2015.  (SR 474-84.)  In that motion, Petitioner asserted that his

appellate attorney was ineffective for failing to argue that the trial court had "abrogated" his right

to present an affirmative defense when it told Petitioner that "he could only make suggestions to

his attorney and his attorney should hear what he had to say, but the 'ultimate decision' on what

the appropriate strategy [was] his attorney['s] decision . . . to make."  (SR 476.)  The People filed

an opposition on February 3, 2016.  (SR 485-92.)

The Appellate Division denied the motion without explanation on March 1, 2016.

(SR 499.)  Petitioner sought leave to appeal to the Court of Appeals on or about March 14, 2016

(SR 496-98), and that leave application was denied on May 19, 2016 (SR 503).

### 4.      Petitioner's § 440.20 Motion

On July 23, 2015, Petitioner filed a *pro se* motion to set aside his sentence pursuant to

C.P.L. § 440.20, on the ground that he had received ineffective assistance of trial counsel.

(SR 147-59.)  In this motion, Petitioner argued that "his trial counsel failed to properly represent

him during the [violent felony offender ("VFO")] hearing," and specifically, that his counsel

"did not present any evidence to establish that [Petitioner's] 2002 sentence was

---

[14] As noted above (*see supra*, at n.12), Respondent does not cite to this decision in his recitation of the relevant procedural history, but instead cites, seemingly in error, to the Appellate Decision's decision denying a *coram nobis* application that Petitioner had apparently filed earlier.

unconstitutionally obtained."  (SR 152.)  In particular, Petitioner contended that, at his 2012

sentencing, his counsel should have argued that Petitioner had been deprived of effective

assistance of counsel in the 2002 proceedings.  (*See* SR 157.)  Specifically, Petitioner argued:

> [A]t the 2012 VFO hearing . . . the People presented the
> November 15, 2002, sentence minutes, along with a certificate of
> disposition . . . and the live testimony [of] a fingerprint
> examiner . . . .   The defense did not present any evidence, and
> when the Court asked defense counsel if he wish[ed] to make any
> argument he responded, 'I will rely on the record . . .'
> Immediately after defense counsel['s] concession, the Court found
> that the People's allegations went 'uncont[ro]verted,' and
> determined that [Petitioner] was a persistent violent felony
> offender.

(*Id.*)

The People filed an opposition to Petitioner's motion on November 9, 2015.

(SR 237-49.)  The People argued that, at Petitioner's "second violent felon adjudication" in

2002, Petitioner had been "afforded an opportunity to challenge his 1994 conviction on

constitutional or other grounds."  (SR 243.)  They stated that Petitioner had chosen not to do so,

despite the fact the "Court Clerk [had] informed [Petitioner] that he could controvert any

allegation in the People's predicate felony statement on the grounds that the 1994 conviction was

unconstitutionally obtained and that his failure to do so would constitute a waiver of any

allegation of unconstitutionality."  (SR 244-45.)  As, thereafter, Petitioner would have had no

basis for challenging that 2002 adjudication, the People argued that, at his 2012 sentencing,

Petitioner's counsel could not have been ineffective for failing to raise a futile claim.  (SR 246.)

Petitioner filed a reply on or about November 14, 2015.  (SR 250-54.)  In his reply, he

argued that he received ineffective assistance of counsel at his 2012 sentencing because his

counsel had failed to challenge his 2002 conviction as a predicate for the court's finding him a

persistent violent felon (*see* SR 250-51), and he further reiterated his position that, at his 2002

sentencing, he had not been afforded an opportunity to challenge his prior 1994 conviction

(SR 252-53).

      The trial court denied Petitioner's motion by a written opinion, dated December 4, 2015.

(SR 255-62.)  The court noted that "[a] finding that a defendant is a second violent felony

offender is binding in any future proceeding" and that a defendant is "precluded by statute from

contesting the use of a prior conviction as a predicate conviction where he has previously been

adjudicated a second violent felony offender based on that conviction."  (SR 259 (citing

*People v. Odom*, 63 A.D.3d 408, 409 (1st Dep't 2009)).)  The court stated that the record from

Petitioner's 2002 hearing reflected that he had been advised by the presiding judge that he could

"controvert any allegations in the predicate violent felony statement regarding his prior

conviction, and [] that 'failure to challenge the previous conviction . . . [would be] a waiver . . .

of any allegation of unconstitutionality . . . .'"  (SR 259.)  According to the trial court, upon

being asked

> whether [he] 'wished to controvert any allegation in the statement
> on the grounds that the [1994] conviction was unconstitutionally
> obtained[,]' [Petitioner] conferred with counsel, and ultimately
> spoke directly to the [then-presiding judge] and admitted 'it was
> me[,]' but said, in essence, he pled to the 1994 offense because he
> thought it was better to enter a plea and avoid the risk of trial.

(SR 259-60.)  The court further noted that, when the presiding judge responded, "'That doesn't

make the conviction unlawful,' [Petitioner] said he had nothing else," leading to his being

sentenced as a violent predicate felony offender.  (SR 260.)  Holding that Petitioner's

adjudication as a second violent felony offender in 2002 was "binding," the trial court denied

Petitioner's Section 440.20 motion.  (SR 259.)  The court further explained that counsel "ha[d] a

duty to the Court not to file frivolous motions," and that counsel's "failure to make a frivolous

challenge to the Court regarding the predicate violent felony offender statement [did] not mean counsel was ineffective."  (SR 260.)

Petitioner requested leave to appeal to the Appellate Division, First Department on February 16, 2016.  (SR 263-85.)  There is, however, no decision on Petitioner's leave application in the submitted State Court Record, and this Court has not independently located such a decision.

### 5.   Petitioner's § 440.10 Motion

On or about May 14, 2016, Petitioner filed a *pro se* motion to vacate his conviction pursuant to C.P.L. § 440.10, based primarily on another claim that he had received ineffective assistance of trial counsel.  (*See generally* SR 286-395.)  In addition, Petitioner appeared to raise certain due-process claims focused on the conduct of the trial court – contending, in particular, that the court had failed to inform him of his right to be present and had deprived him of that right (*see* SR 296-98, 308-09, 330, 342-42, 345-52); had wrongfully denied him new counsel, in the face of evidence that he was not being adequately represented by his then-current counsel (*see* SR 327, 335, 352), and/or had deprived him of his right to proceed at trial *pro se* (*see* SR 306-09, 311, 24, 327, 330-33, 336, 339, 342).  In support of this motion, Petitioner submitted both an affidavit (SR 288-301) and a memorandum of law (SR 302-75).

With respect to Petitioner's ineffective-assistance-of-trial-counsel claim, although his motion papers were lengthy and, at times, his points seemed somewhat jumbled, Petitioner at least appeared to contend that his counsel, Fusfeld, was ineffective because he:

> (1)   failed to object to trial testimony by Detective Rojas identifying Petitioner as the person seen in a surveillance video (from which the wanted poster was derived) (*see* SR 292-93, 297, 310-12, 354-65, 370);

(2)      failed to object to the inclusion of references to a "drill bit" and "lock picks" in the verdict sheet (*see* SR 292-93, 310, 312, 372);

(3)      failed to request a missing-witness charge for Officer Rosaly, who was present when Petitioner was arrested but did not testify at trial (*see* SR 293, 310, 365-69, 371-72);

(4)      failed to investigate Petitioner's assertion that "a camera in [the] vicinity of [the location where Petitioner was stopped] would provide proof that [Petitioner] was illegally stopped and frisked without probable cause" (SR 295);

(5)      failed to inform Petitioner that he had the right to be present for all court proceedings and that the trial would proceed in his absence if he did not appear, and also failed to object to the trial court's ruling that Petitioner had waived his right to be present (*see* SR 293, 295-96, 298, 331, 351, 370);

(6)      failed to withdraw from representing Petitioner despite a "conflict of interest," and failed to advocate for Petitioner's right to be assigned new counsel (*see* SR 296, 323-26, 328-29, 334, 344-45, 370);

(7)      failed to inform Petitioner that he had a right to proceed *pro se*, and failed to advocate for that right (*see* SR 293, 325-27, 329, 331, 333-34, 336, 340, 370);

(8)      failed to object when the court responded to a juror's question without first consulting counsel (*see* SR 292-93, 371-72); and

(9)      (as Petitioner had argued on his Section 440.20 motion) failed to address the unconstitutionality of Petitioner's prior conviction, in connection with his adjudication, at sentencing, as a persistent violent felony offender (*see* SR 373).

Petitioner also argued that he was deprived of the effective assistance of counsel by the cumulative effect of counsel's many alleged failures. (*See* SR 313, 369-74.)

The People filed an opposition to Petitioner's Section 440.10 motion on August 4, 2016 (SR 396-427), arguing that "[t]he majority of [Petitioner's] contentions [were] subject to a

mandatory procedural bar (and otherwise fail[ed] on the merits)" (SR 420).  First, the People

pointed out that, on Petitioner's direct appeal, the Appellate Division had rejected Petitioner's

contentions regarding his alleged "conflict of interest" with Fusfeld, regarding the propriety of

the court's response to a juror question, and regarding the legality of Petitioner's "stop and

frisk."  (*Id*.)  Accordingly, the People argued that Petitioner was "barred from advancing a claim

of ineffective assistance of counsel based on th[o]se issues."  (*Id*. (citing N.Y. C.P.L.

§ 440.10(2)(a)).)  The People also argued that those claims were meritless, pointing out, for

example, that Petitioner's contention that his attorney had failed to investigate the existence of

surveillance video of the stop and frisk was undermined by the fact that a video of the stop and

frisk was actually introduced at trial.  (*Id*.)

Second, the People argued that several of Petitioner's ineffective-assistance claims –

including his claims based on "Fusfeld's failure to object to the Court's ruling that [Petitioner]

waived his right to be present at trial; failure to object to alleged testimony by a police officer

identifying [Petitioner] as the person seen in the surveillance video; alleged failure to object to

the [] inclusion of 'drill bit' and 'lock picks' in the verdict sheet; and failure to request a missing

witness charge based on the absence of Officer Rosaly" – could have been raised on Petitioner's

direct appeal, and were therefore also barred.  (SR 421.)  Notwithstanding the procedural bar, the

People argued that these claims, too, were without merit.  (SR 421-23.)

Third, the People argued that Petitioner's challenge to Fusfeld's failure to challenge

Petitioner's 2002 adjudication as a second violent felon – a claim that had already been denied in

the context of his Section 440.20 motion (discussed above) – was based on a "false" premise,

and that counsel's "decision not to raise a futile argument at [Petitioner's] sentencing" could not

serve as a basis for vacating his conviction, under Sections 440.10(2)(d), 440.10(3)(b), or 440.30(4)(d) of the New York Criminal Procedure Law.

Finally, the People argued that Petitioner could not prevail on a claim that Fusfeld was ineffective for failing to withdraw, despite Petitioner's alleged expressed desire to proceed *pro se*, as Petitioner never made "a 'clear[[] and unequivocal[]' request [to the court] to proceed *pro se*," as required by applicable state law.  (SR 424-25 (quoting *People v. Gilliam*, 8 N.Y.3d 85 (2006)).)

The trial court (Justice Hayes) issued a decision on Petitioner's Section 440.10 motion on September 30, 2016.[15]  (SR 428-39.)  After recounting the relevant procedural history of the case (*see* SR 428-30), the court first held that it was "procedurally barred from considering the merits" of any claim that had already been denied on the merits of Petitioner's direct appeal, including any claim challenging either the lawfulness of Petitioner's stop and frisk or the court's denial of Petitioner's request for new counsel because of the "conflict" that had allegedly arisen between Petitioner and Fusfeld (SR 431 (citing N.Y. C.P.L. § 440.10(2)(a)).  Further, the court noted that it had the discretion to deny any claim that had previously been rejected on the merits in a prior Section 440 motion (*id.* (citing N.Y. C.P.L. § 440.10(3)(b)), and "decline[d] to entertain . . . for a second time" the claim Petitioner had raised in his earlier Section 440.20 motion – *i.e.*, his claim that he had received ineffective assistance of counsel at his sentencing, because of counsel's failure to challenge his violent felony offender adjudication (*id.*).  Despite this, the court stated that it had "nevertheless reviewed both claims," presumably referring to the

---

[15] This decision references a reply that had apparently been filed by Petitioner and received by the trial court on September 9, 2016 (SR 430), but the State Court Record does not appear to contain a copy of that reply.

claims that Petitioner had previously raised both on direct appeal and in his Section 440.20 motion, and found that "relief [was] not warranted."  (SR 432.)

The court then went on to address the merits of most of Petitioner's claims.[16]  It rejected as "conclusory" Petitioner's claim that his counsel had failed to investigate surveillance camera footage that, Petitioner contended, would have shown that the officers lacked a basis to stop and frisk him.  (SR 432-33.)  As to this claim, the court also noted that the Appellate Division had "previously concluded the officers had reasonable suspicion to stop and frisk" Petitioner. (SR 433.)

As to Petitioner's claim that his counsel was ineffective for failing to withdraw from representing him despite a "conflict of interest" and for failing to inform the court that Petitioner wished to represent himself, the court noted that Fusfeld had been Petitioner's third court-appointed attorney.  (*Id*.)  The court further noted that, while it had issued a letter to Petitioner stating, "the Court will not consider appointing a new attorney for you unless and until you come to Court to make that request," Petitioner "did not heed that warning and appear in person to make such a request."  (*Id*.)  Overall, the court observed that Petitioner's requests "for new counsel, claims of conflict, claims he would do harm to himself, and absenting himself from the courtroom appeared to be a pattern of behavior displayed . . . over and over when he did not like the manner in which his case was proceeding" (SR 433-34), and that Petitioner's "actions

---

[16] In listing the claims that it understood Petitioner to have been raising on his motion (*see* SR 430), the court did not include – and then did not address – any claim that Petitioner's counsel was ineffective for failing to object to the court's responding to a juror question without first consulting counsel.  (*See* generally SR 428-38.)  In addition, while, as set out below, the court considered and rejected as unsupported Petitioner's contention that he had wished to proceed *pro se* at trial, but had been denied that opportunity (*see* SR 434), the court did not separately address Petitioner's claim that his trial counsel was ineffective for *failing to inform* Petitioner that he had a right to proceed *pro se*.

appeared to be a delay tactic[] rather than the result of any conflict with counsel" (SR 434).

Additionally, the court noted that the Appellate Division had concluded there was no error in

denying Petitioner's request for new counsel based on the supposed "conflict." (SR 434.) For

these reasons, the court found that a request by counsel to withdraw based on the alleged

"conflict" would have "had no likelihood of success," and the court accordingly denied

Petitioner's claim that Fusfeld was ineffective for failing to make such a request. (SR 434.)

    With regard to Petitioner's claim that he was denied the right to proceed *pro se*, the court,

as noted above, did not squarely address Petitioner' claim that Fusfeld had allegedly failed to

inform him that he had that right. (*See supra*, at n.16.) The court did, however, state that

Petitioner had "never unequivocally informed the Court in person that he wanted to represent

himself," but rather had complained only that he disliked his attorney and wanted a new one.

(SR 434.) The court therefore found that Petitioner's allegation that he had wished to proceed

*pro se* was "unsupported," "conclusory," and "lack[ing] [in] "reliability," and that no evidentiary

hearing was required on the issue. (*Id.*)

    As to Petitioner's contention that he "was not alerted to the fact that the trial would be

conducted in his absence," the court found that such claim was "unsupported and [] contradicted

by the record." (SR 434.) Justice Hayes noted that Petitioner "had been told repeatedly" – by

multiple judges of the court, as well as by defense counsel, and in writing – "that the proceedings

would continue with or without him." (SR 435 (quoting a letter that had been sent to Petitioner

by the court to inform him that, while the court would not force him to attend the trial, "'the trial

will continue, even if you do not attend' and 'you will give up many important rights' if you

choose not to attend").) Finding the record to be clear that Petitioner "was informed the trial

would continue in his absence, but nevertheless elected not to attend," the court held that no relief on this claim was warranted.  (*Id.*)

The court also rejected Petitioner's claim that his trial counsel was ineffective for failing to object to Rojas's testimony identifying Petitioner on surveillance videotape; as to this claim, the court noted that, at trial, police officers had identified Petitioner's face in "close-up photographs," but found that, "[e]ven if such a statement regarding [Petitioner] on the surveillance videotape was made on re-direct by an officer as [Petitioner] allege[d], there was 'some basis for concluding that the witness [was] more likely to correctly identify the defendant from the [video] than [was] the jury'" (SR 435-36 (quoting *People v. Montanez*, 135 A.D.3d 528 (1st Dep't 2016))), "especially in light of the fact that the officer was more familiar with [Petitioner's] face than was the jury, as [Petitioner] failed to appear in the courtroom" (*id.*).

As to Petitioner's assertion that he was entitled to a missing witness charge because "the officer who frisked him and recovered the drill bit did not testify, and that counsel was ineffective for failing to request such a charge," the court held that Petitioner had not established that a missing witness charge would have been warranted, even if requested.  (SR 436.)  In rejecting Petitioner's claim, the court noted that one of the officers who had conducted the stop did testify at trial, and the court reasoned that Petitioner had failed to demonstrate how the missing officer's testimony would have been "favorable" to Petitioner, "material, and not cumulative of the other three officers who testified."  (*Id.* (citation omitted).)

Regarding Petitioner's assertion that his counsel should have objected to the annotations "drill bit" and "lock picks" on the verdict sheet, the court pointed out that counsel *did* object to those annotations, and that they were removed from the verdict sheet."  (SR 436-37.)

33

Finally, circling back to Petitioner's claim that his counsel was ineffective for failing to challenge the persistent violent felony offender adjudication, the court noted that Petitioner had not controverted the allegations in the predicate felony statement in 2002, and that the 2002 adjudication of Petitioner as a second violent felony offender was therefore "binding on th[e] court." (SR 437.) Under the circumstances, the court held that Petitioner could not show that, had Fusfeld challenged the predicate violent felony statement, he would have had any likelihood of success. (*Id.*)

"In sum," the court concluded, "'viewed in totality and as of the time of the representation' . . . [Petitioner's trial] counsel provided meaningful representation." (*Id.* (citing *People v. Baldi*, 54 N.Y.2d 137 (1981)).)

On or about November 22, 2016, Petitioner filed an application to the Appellate Division, First Department, for leave to appeal from "each and every part" of the trial court's denial of his Section 440.10 motion. (SR 440-62.) The People opposed Petitioner's motion on December 13, 2016 (*see* SR 464-68), and Petitioner filed a reply on or about December 16, 2016 (SR 469-72). On February 14, 2017, the Appellate Division denied leave to appeal on the ground that there was "no question of law or fact presented" that warranted review. (SR 473.)

> ### D.   Federal Habeas Petition

Petitioner, proceeding *pro se*, commenced this habeas action by filing his Petition on April 13, 2017.[17] The Petition asserts four grounds for habeas relief, three of which (Grounds

---

[17] Under the so-called "prison mailbox rule," *see Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001), *cert. denied*, 534 U.S. 886, a *pro se* prisoner's habeas petition is deemed "filed" on the date he gives it to prison officials for delivery to the court, *see id.*; *Houston v. Lack,* 487 U.S. 266, 270 (1988). Here, Petitioner has declared under penalty of perjury that he placed his Petition in the prison mailing system on April 13, 2017 (*see* Pet., at 16), and this Court will therefore deem that to be the date of filing.

One, Two, and Four) are based on claims of ineffective assistance of trial counsel, and the last of

which (Ground Three) is based on a claim of ineffective assistance of appellate counsel.

### 1.  Ineffective-Assistance-of-Trial-Counsel Claims

As to Petitioner's challenges to the effectiveness of his trial counsel, Petitioner's first

stated ground for relief appears to rest on three factual contentions:  (a) a general contention that

his counsel "fals[e]ly told the court that he knew about [Petitioner's] case, investigated, and

prepared for the case"; (b) the specific contention that counsel failed to inform the court that

Petitioner had "fired him" and that Petitioner wished to proceed *pro se*; and (c) the somewhat

cryptic contention that counsel "failed to mention[] subject matter jurisdiction to the court."

(Pet., at 6 ¶ 12(a) (Ground One).)  Liberally construed, this Court understands Petitioner's

allegation that his counsel failed to investigate his case to relate to Petitioner's earlier advanced

assertion (in his Section 440.10 motion) that Fusfeld failed to explore the existence of video

surveillance tape that, according to Petitioner, would have shown that there was no probable

cause for his being stopped and frisked.  Petitioner has said nothing to clarify his reference to the

trial court's supposed lack of "subject matter jurisdiction," and this Court declines to speculate as

to Petitioner's intended argument.

In his second stated ground for relief, Petitioner alleges that he received ineffective

assistance of trial counsel because counsel "failed to object to evidence introduced at [the]

suppression hearing and pictures of [Petitioner]," despite the fact that Petitioner allegedly "was

walking on the street [and] stopped and arrested without probable cause."  (Pet., at 8 ¶ 12(a)

(Ground Two).)  Petitioner does not specify, in this claim, the "evidence" to which he is

referring, although, liberally construed, his allegations may relate to the physical evidence taken

from him after he was stopped and arrested (including the drill bit, the duffel bag containing

stolen property, and the lock picks).  Further, although Petitioner's reference to the "pictures" of

himself is also somewhat unclear, a liberal reading of that allegation suggests that he may be

referring to the images on the surveillance video and the still image taken from the video and

placed on the wanted poster.[18]

Finally, in his fourth stated ground for relief, Petitioner alleges that his trial counsel was

ineffective because, in the context of Petitioner's adjudication as a persistent violent felony

offender, counsel failed to challenge Petitioner's prior convictions.  (*See id.*, at 11 ¶ 12(a)

(Ground Four).)

### 2. <u>Ineffective-Assistance-of-Appellate-Counsel Claim</u>

Separately, as to his claim that he received ineffective assistance of appellate counsel,

Petitioner alleges, in his third stated ground for habeas relief, that his appellate counsel was

ineffective for failing to raise a due-process claim, on direct appeal, challenging the trial court's

action in responding to a juror's question without first affording counsel an opportunity to be

heard.  (*Id.*, at 9 ¶ 12(a) (Ground Three).)

### 3. <u>Opposition and Reply</u>

Respondent filed an opposition to the Petition on December 15, 2017 (*see* Resp. Mem.;

*see also* Declaration of Alyson J. Gill, Esq., dated Dec. 15, 2017 (Dkt. 16) (answering the

Petition)), along with the State Court Record and transcripts referenced above.  In opposition,

---

[18] This Court notes that, in his reply submission in this habeas proceeding (Declaration of Teofilo Reyes, dated Jan. 15, 2018) ("Pet. Reply") (Dkt. 21)), Petitioner, without further explanation, describes the claims in his Petition as including, *inter alia*, a claim that his trial counsel was ineffective for failing to "object to evidence (tangi[]ble and intangible) introduced at suppression hearing and trial" (*id.* ¶ 4).  While, in light of Petitioner's *pro se* status, it is appropriate for this Court to refer to Petitioner's various submissions before the state courts to gain a better understanding of the intended substance of his habeas claims, this Court cannot engage in pure speculation as to what he may mean by evidence "tangible and intangible."

Respondent argues that Petitioner's ineffective-assistance-of-counsel claims should all be denied

on the merits.  (*See generally* Resp. Mem.)

Petitioner filed a Reply on January 15, 2018.  (*See* Pet. Reply.)[19]  In his Reply, Petitioner

does little more than assert the blanket validity of the claims in the Petition.  In briefly

summarizing his claims in this proceeding, though (*see id*. ¶ 4), Petitioner seems to suggest that

his Petition contain ineffective-assistance-of-trial-counsel claims that, even liberally construed,

the Petition cannot be read to include.  For example, in his Reply, Petitioner refers to an

ineffective-assistance claim regarding "secured photos of lift fingerprint."  (*Id*.)  On this point,

this Court notes that, in his Section 440.10 motion, Petitioner stated the following:

> While there is evidence of a fingerprint being of the [Petitioner's]
> that was left inside one of the apartments, that still did not in itself
> prove the overall elements of Burglary in the Second Degree.
> Besides, the jury questioned the recovery of [Petitioner's] prints by
> requesting to see a 'photo of fingerprint,' in a jury note during
> deliberations.  If the evidence was so overwhelming, in regards to
> the two (2) fingerprints, then, why would the jury request to review
> the 'fingerprint' evidence.

(SR 362.)  This, however, does not suggest any ineffective assistance of trial counsel, and it also

does not appear to relate, even tangentially, to any allegation contained in the Petition.

Petitioner also appears to contend in his Reply that his trial counsel was ineffective for

failing to call one or more witnesses at trial.  (*See* Pet. Reply ¶ 4 ("trial counsel was ineffective

for failing to . . . called [sic] missing witness (officer and expect [sic] witness for defense)").)

On this point, this Court notes that Petitioner previously argued, in the context of his

Section 440.10 motion, that his trial counsel should have requested a missing-witness charge

based on the fact that Officer Rosaly (who recovered the drill bit from Petitioner's pocket upon

---

[19] Although Petitioner's Reply was not docketed until January 18, 2018, it is deemed filed
on the date it was signed by Petitioner.  (*See supra*, at n.17.)

his arrest) was not called to testify at trial.  (*See* SR 365-69.)  That claim, however (regarding the

alleged failure to request a missing-witness charge), is nowhere referenced in the Petition, nor

does the Petition anywhere suggest that Petitioner's trial counsel was ineffective for failing to

call Officer Rosaly to the stand, or for failing to call any other particular witness who would have

been likely to provide testimony favorable to Petitioner.  Nor does Petitioner's Reply contain any

specific information on this point, and this Court therefore finds no basis for expanding its initial

reading of the Petition, as set out above.

## DISCUSSION

I.    **APPLICABLE LEGAL STANDARDS**

    A.    **Statute of Limitations**

      Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas

petition must be filed within one year of the latest of four dates specified by statute, usually "the

date on which the judgment became final by the conclusion of direct review or the expiration of

the time for seeking such review."[20]  28 U.S.C. § 2244(d)(1)(A); *see also Williams v. Artuz*,

237 F.3d 147, 150-51 (2d Cir. 2001) (judgment becomes "final" for purposes of Section 2244

upon "the completion of direct appellate review in the state court system and either the

completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner

elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via

certiorari").  The limitations period is tolled during the pendency of any "properly filed

---

[20] The limitations period may alternatively begin to run on the following dates:  (1) where
the petitioner was prevented from filing an application by state action, the date on which the
impediment is removed; (2) where the right asserted is a newly recognized one made
retroactively applicable, the date on which the constitutional right asserted was initially
recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim
presented could have been discovered through the exercise of due diligence.  28 U.S.C.
§ 2244(d)(1)(B)-(D).

application for State post-conviction or other collateral review with respect to the pertinent

judgment or claim."  28 U.S.C. § 2244(d)(2).

### B.   Exhaustion of State Remedies

As a general matter, a federal court may not consider a petition for a writ of habeas

corpus unless the petitioner has exhausted all state judicial remedies for his federal claims.

28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Picard v. Connor*,

404 U.S. 270, 275 (1971) (exhaustion requirement, as now codified in AEDPA, "reflects a policy

of federal-state comity"); *Rhines v. Weber*, 544 U.S. 269, 273-74 (2005) ("the interests of comity

and federalism dictate that state courts must have the first opportunity to decide a petitioner's

claims" (citation omitted)).

To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented"

his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and

correct' alleged violations of . . . prisoners' federal rights."  *Picard*, 404 U.S. at 275 (quoting

*Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)).  A petitioner may fairly present a federal

claim in several ways, including by citing relevant provisions of the federal Constitution in his

appellate brief, *see Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001), or by relying on "pertinent

federal cases employing constitutional analysis" or "state cases employing constitutional analysis

in like fact situations," *see Mallet v. Miller,* 432 F. Supp. 2d 366, 374 (S.D.N.Y. 2006)

(enumerating the ways a petitioner may fairly present his federal claims in state court).  Raising a

claim purely in state-law terms will generally be insufficient to exhaust the federal claim.  *See*

*Legrand v. Lee*, No. 13cv05282 (PKC) (KHP), 2016 WL 7468195, at *8-9 (S.D.N.Y. Dec. 28,

2016), *report and recommendation adopted*, 2017 WL 837683 (Mar. 2, 2017) (discussing

*Diguglielmo v. Senkowski*, 42 Fed. App'x 492, 495 (2d Cir. 2002) (Summary Order)).  Under

certain circumstances, however, even "a minimal reference" to the appropriate Constitutional

provision can potentially satisfy the exhaustion requirement. *Reid v. Senkowski*, 961 F.2d 374,

376 (2d Cir. 1992).

Aside from setting out the federal nature of his claims, the petitioner must also, for

purposes of the exhaustion requirement, present those claims to "the highest court of the

pertinent state." *Chebere v. Phillips*, No. 04cv296 (LAP), 2013 WL 5273796, at *19 (S.D.N.Y.

Sept. 18, 2013) (quoting *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994)).  In New York, for a

claim that can be raised on direct appeal, a petitioner must first appeal his conviction to the

Appellate Division and then seek "further review of that conviction by applying to the Court of

Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir.

2005).[21]  Where a claim is not appropriate for direct appeal because it cannot be demonstrated on

the basis of the pre-trial or trial record, a petitioner may exhaust the claim by raising it to the

state trial court in a collateral post-conviction motion, typically in a motion made pursuant to

Section 440 of the New York Criminal Procedure Law.  *See, e.g.*, *Reyes v. Phillips*, No.

02cv7319 (LBS), 2005 WL 475544, at *4 (S.D.N.Y. Mar. 1, 2005) ("[A] motion under N.Y.

Crim. Proc. Law § 440.10 was the appropriate vehicle with which to exhaust [petitioner's]

ineffective-assistance-of-counsel claim insofar as it relied upon evidence outside the record."),

---

[21] A claim is appropriate for direct appeal when it can be demonstrated on the basis of the pretrial record, the trial record, or a record developed in the trial court on a motion made under Section 330.30 to set aside the verdict.  *Cf. Ford v. Smith*, 12cv8993 (VB) (LMS), 2016 WL 7647042, at *12 (S.D.N.Y., Aug. 3, 2016) (noting that a claim raised in a Section 330.30 motion made the claim a part of the record on appeal), *report and recommendation adopted,* 2017 WL 27982 (Jan. 3, 2017).  Where a claim is inappropriate for direct appeal because it cannot be reviewed on the record developed in the trial court, it may be raised in a collateral postconviction motion, typically in a motion made pursuant to Section 440 of the New York Criminal Procedure Law.  Here, Petitioner did not file any collateral motions in the state court under Section 440, and he contends that he exhausted all of his claims on direct appeal.

and by then seeking leave to appeal to the Appellate Division, *see Ture v. Racette*,

No. 9:12cv01864 (JKS), 2014 WL 2895439, at *4 (N.D.N.Y. June 26, 2014).  A petitioner may

also exhaust a claim by raising it to the state trial court or the appropriate Appellate Division on a

state petition for a writ of habeas corpus, *see* N.Y. C.P.L.R. § 7002, and by then appealing from

the denial of that petition, *see* N.Y. C.P.L.R. § 7011; *see also Garcia v. Laclair,* No. 06cv10196

(SHS) (DF), 2011 WL 1097414, at *14 (S.D.N.Y. Jan. 3, 2011) (finding that habeas claim was

unexhausted where petitioner had not appealed from the denial of a state habeas petition), *report*

*and recommendation adopted,* No. 06cv10196 (SHS), 2011 WL 1046058 (Mar. 22, 2011).

Finally, a petitioner may exhaust a claim of ineffective assistance of appellate counsel by raising

that claim to the Appellate Division on a motion for a writ of error *coram nobis*, and by then

seeking leave to appeal the denial of that motion to the Court of Appeals.  *See Shomo v. Maher*,

No. 04cv4149 (KMK), 2005 WL 743156, at *3 (S.D.N.Y. Mar. 31, 2005) (citing N.Y.C.P.L.

§§ 450.90(1), 460.10(5)(a)).

      Where a petitioner presents one or more unexhausted claims in a habeas petition that also

includes exhausted claims, the district court may dismiss the entire petition without prejudice, or,

in certain circumstances, it may stay the petition and hold it in abeyance, so as to allow the

petitioner to exhaust the unexhausted claim(s) without risk that the one-year limitations period

will expire prior to the time when the petitioner would realistically be able to return to the federal

court, should his claims be rejected by the state courts.  *See generally Rhines*, 544 U.S. at 277-

78.  In *Rhines*, the Supreme Court also noted that, "if a petitioner presents a district court with a

mixed petition [*i.e.*, one containing both exhausted and unexhausted claims] and the court

determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete

the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire

petition would unreasonably impair the petitioner's right to obtain federal relief." *Id.* at 278.

In addition, despite the exhaustion requirement set out in AEDPA, the statute also

provides that the federal court may proceed to deny an unexhausted habeas claim, if it is

apparent that the claim is without merit. 28 U.S.C. § 2254(b)(2) ("An application for a writ of

habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to

exhaust the remedies available in the courts of the State."). The court, however, should only

deny an unexhausted claim where it is plainly without merit. *Edwards v. Superintendent,*

*Southport C.F.*, 991 F. Supp. 2d 348, 381 (E.D.N.Y. 2013).

## C.   Procedural Default of Federal Habeas Claims

As a general matter, federal habeas review is not available where a claim has been raised

before the state courts, and the last-reasoned decision of the state courts "rests on a state law

ground that is independent of the federal question and adequate to support the judgment."

*Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *see also Ylst v. Nunnemaker*, 501 U.S. 797,

803 (1991). Such a state-law ground may involve the application of a procedural rule, such as a

state rule requiring a defendant to raise a contemporaneous objection at trial in order to preserve

an issue for appeal. *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977). For the state-law ground to

be found to have provided an "independent" basis for the state court's decision, the court's

reliance on that ground "must be clear from the face of the opinion." *Fama v. Comm'r of Corr.*

*Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Coleman*,

501 U.S. at 735). For a state procedural rule to be deemed an "adequate" basis for the state

court's decision, the rule must be "firmly established and regularly followed" by the state, *see*

*Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (internal quotation marks and citation omitted),

and must not have been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert*,

331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks and citation omitted).

In order to overcome the procedural bar to federal habeas review, the petitioner must

show both "cause" for the procedural default and "prejudice" resulting therefrom. *See Coleman*,

501 U.S. at 749-50. "Cause" is established when "some objective factor external to the defense"

impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*,

477 U.S. 478, 488 (1986). More specifically, a petitioner can show "cause" for a procedural

default when (1) "the factual or legal basis for a claim was not reasonably available," (2) "some

interference by state officials made compliance [with the procedural rule] impracticable," or

(3) "the procedural default is the result of ineffective assistance of counsel." *Bossett*, 41 F.3d

at 829 (internal quotation marks and citation omitted). As for the "prejudice" prong, while the

Supreme Court has not given "precise content" to the term "prejudice," *see Sykes*, 433 U.S.

at 91, it has made clear that a petitioner must show more than "a *possibility* of prejudice;" rather,

the legal errors raised in the petition must have "worked to [the petitioner's] *actual* and

substantial disadvantage," *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in

original). This is "a significantly higher hurdle than would exist on direct appeal," *id.* at 166, as

the degree of prejudice must be sufficient "to overcome society's justified interests in the finality

of criminal judgments," *id.* at 175.

A defaulted claim may also be reviewed in a federal habeas proceeding where a

"fundamental miscarriage of justice" would result from the court's failure to review the claim;

but, to satisfy this exception to the procedural bar, the petitioner must make a showing of actual

innocence. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see also Dunham v. Travis*, 313 F.3d

724, 730 (2d Cir. 2002). "Actual innocence" means "factual innocence, not mere legal

insufficiency." *Dunham*, 313 F.3d at 730 (citation omitted).  To support an allegation of a

fundamental miscarriage of justice, the petitioner must bring forward "new reliable evidence –

whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

physical evidence – that was not presented at trial."  *Schlup*, 513 U.S. at 324.

  Where a petitioner presents an unexhausted claim, but, under state procedural law, no

longer has any available avenue to pursue the claim in the state courts (as when, for example, a

claim is record-based, but the petitioner failed to raise it in his one opportunity for direct appeal),

the claim should be deemed exhausted for purposes of federal habeas review.  *See Grey v. Hoke*,

933 F.2d 117, 120-21 (1991); *Castille v. Peoples*, 489 U.S. 346, 351 (1989).  The state-law

procedural bar that gives rise to the claim's being deemed exhausted, however, "provides an

independent and adequate state-law ground for the conviction and sentence, and thus prevents

federal habeas review of the defaulted claim, unless petitioner can demonstrate cause and

prejudice for the default."  *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (citations omitted);

*see also, e.g.*, *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003) ("[W]e conclude that [the

petitioner's] appellate counsel unjustifiably failed to argue this ineffective assistance claim on

direct appeal despite a sufficient record . . . .  Accordingly, [the petitioner's] claim is

procedurally defaulted for the purposes of federal habeas review as well.").

  **D.**  <u>**Standard of Review**</u>

  When this Court reviews a federal constitutional claim that has been adjudicated on the

merits by the state court, the Court must accord substantial deference to the state court's decision

under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v.

Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means

"a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the

substance of the claim advanced, rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[22]

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced."  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).  The state court's decision, however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).  In order to be entitled to habeas relief, the petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in

---

[22] In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015)

(quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

## II.    **THE PETITION SHOULD BE DISMISSED.**

### A.    **Timeliness of the Petition**

As a preliminary matter, this Court notes that this Petition appears to be untimely, but

that Respondent has waived the statute of limitations defense.

The AEDPA statute of limitations is an "affirmative defense, not a jurisdictional bar, and

it is therefore the respondent's burden to plead it." *Mejia v. Artus*, No. 12 Civ. 2241 (VMS),

2016 WL 1305162, at *10 (E.D.N.Y. Mar. 31, 2016) (citing *Acosta v. Artuz*, 221 F.3d 117, 122

(2d Cir. 2000)).  Where the defense is not deliberately and intelligently waived by the

respondent, the court has discretion to dismiss a habeas Petition *sua sponte* as time-barred.

*Day v. McDonough*, 547 U.S. 198, 208-09 (2006).  In particular, where the government "does

not strategically withhold the limitations defense or choose to relinquish it and where the

Petitioner is accorded a fair opportunity to present his position," a district court may "consider

the defense on its own initiative and determine whether the interests of justice would be better

served by addressing the merits or by dismissing the petition as time-barred." *Wood v. Milyard*,

566 U.S. 463, 471-72 (2012) (quoting *Day*, 547 U.S. at 210-11) (internal quotation marks

omitted).  If it appears, for example, that a respondent's failure to raise the statute of limitations

defense was due to an "inadvertent error," such as a mathematical error made when calculating

the limitations period, it may be appropriate for a federal court to evaluate the time-bar issue *sua*

*sponte*.  *See Day*, 547 U.S. at 211.  A district court abuses its discretion, however, where it

"override[s] a State's deliberate waiver of the limitations defense."  *Id.*, at 202.

On May 3, 2017, the Honorable Colleen McMahon, U.S.D.J., laid out in detail why it appeared the Petition in this action was time-barred, and directed Petitioner to show cause why his Petition should not be denied on that ground.  (Dkt. 4.)  Petitioner responded on May 30, 2017, essentially conceding that his Petition was not timely filed, but seemingly arguing that the statute should have been equitably tolled.  (Dkt. 5.)  Petitioner stated that he received the "denial from the Appellate Division" on April 5, 2017 (presumably referring to the Appellate Division's denial of leave to appeal the trial court's decision on Petitioner's Section 440.10 motion), and he was therefore not "put on notice" of the denial until that date, despite the fact that the decision had been issued two months earlier, on February 14, 2017.  (*See id.*; *see also* SR 473.)  Respondent did not reply, and on June 5, 2017, the case was reassigned to the Honorable Katherine Polk Failla, U.S.D.J.  On that same day, Judge Failla issued an Order directing Respondent to file and serve an answer to the Petition, and to "limit its response to the timeliness of Petitioner's application for *habeas corpus* relief."  (Dkt. 8.)  Respondent again did not reply, and, in fact, when Respondent eventually filed an Answer to the Petition, that Answer and the accompanying legal memorandum did not so much as mention the timeliness (or untimeliness) of the Petition.  (*See* Dkts. 15 and 16.)

Under these circumstances, where Respondent ignored two separate Orders of the Court directing it to address the statute of limitations, Respondent should be deemed to have waived any statute-of-limitations defense.  Accordingly, this Court will proceed to consider the merits of Petitioner's claims.  *See, e.g., Mejia*, 2016 WL 1305162, at *10 ("[b]ecause Respondent d[id] not raise the untimeliness of the [P]etition, the Court will address the merits of Petitioner's claims."); *Jamison v. Auburn Corr. Facility*, No. 10-CV-3440 (MKB), 2015 WL 8770079, at *5 (E.D.N.Y. Dec. 14, 2015); *Changar v. United States*, No. 10-CV-3123, 2013 WL 2444180, at *3 (E.D.N.Y.

June 5, 2013); *Rosario v. Bennett*, No. 01cv7142 (RMB), 2003 WL 151988, at *2-3 (S.D.N.Y. Jan. 21, 2003).

### B.   The Claims Raised in the Petition Are Without Merit.

#### 1.   Ineffective-Assistance-of-Trial-Counsel Claims

*Strickland v. Washington*, 466 U.S. 668 (1984), sets out a two-part inquiry for claims of ineffective-assistance-of-counsel.  First, a petitioner must show that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms."  *Id.*, at 687-88.  On this prong of the *Strickland* analysis, the reviewing court "must indulge a strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance."  *Id.*, at 689.  In particular, in order to prevail on a challenge to the effectiveness of trial counsel, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  "[J]udicial scrutiny of counsel's performance must be highly deferential" and the court must view the conduct "from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.  In this regard, the court must "bear[ ] in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.'"  *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689).

Second, a petitioner must "affirmatively prove" that he suffered "prejudice" as a result of his counsel's deficient performance.  *Strickland*, 466 U.S. at 693.  This is because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id.*, at 691.  It is not sufficient for the petitioner to show that an error had a "conceivable effect" on the outcome of the trial, as

"virtually every act or omission of counsel would meet that test."  *Id.*, at 693.  Rather, the

petitioner has the burden to show a "reasonable probability" that "but for counsel's

unprofessional errors, the result of the proceeding would have been different."  *Id.*, at 694.  Some

errors made by counsel will have "had a pervasive effect" on the outcome, while others will have

"had an isolated, trivial effect."  *Id.*, at 695-96.  The court must consider "the totality of the

evidence before the judge or jury" and determine if the petitioner "has met the burden of

showing that the decision reached would reasonably likely have been different absent the errors."

*Id.*

The Court may reject an ineffective-assistance-of-counsel claim for failure to satisfy

either prong of the *Strickland* standard, without reaching the other.  *Id.*, at 697 (stating that "[i]f

it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,

which we expect will often be so, that course should be followed").

**a.      Trial Counsel's Alleged Failure To Investigate
and Prepare a Defense and To Advocate For
<u>Petitioner's Right To Proceed *Pro Se* (Ground One)</u>**

Petitioner's first stated ground for habeas relief is that his trial counsel was ineffective

for:  (a) "fals[e]ly" telling the court that he had investigated and prepared for the case; (b) failing

to inform the court that Petitioner had fired him and that Petitioner wished to continue *pro se*;

and (c) failing to "mention[] subject matter jurisdiction to the court."  (Pet., at 6 ¶ 12(a).)

Petitioner claims that he raised these alleged deficiencies in his counsel's performance

before the state courts, both on his direct appeal (Pet., at 6 ¶ 12(c)), and in his Section 440.10

motion (*id*. ¶ 12(d)).  On direct appeal, however, while Petitioner raised a claim that the trial

court erred in failing to appoint him new counsel (Pet. App. Mem., at SR 9-15, 23-33), he did not

raise any claim regarding his counsel's failure to investigate or prepare a defense, or his

49

counsel's failure to inform the court that Petitioner had fired him, or that Petitioner wished to

proceed *pro se* (*see generally id.*).

On the other hand, liberally construing both the Section 440.10 motion, *see Felder v.

Goord*, 564 F. Supp. 2d 201, 213 n.5 (S.D.N.Y. 2008), and the habeas Petition, *see Williams v.

Breslin*, 274 F. Supp. 2d 421, 425 (S.D.N.Y. 2003), it appears that Petitioner did raise the first

two parts of this ineffective-assistance-of-counsel claim in his Section 440.10 motion.  In

particular, he argued on that motion that his trial counsel was ineffective for failing to investigate

Petitioner's assertion about a camera that would supposedly have provided proof that Petitioner's

stop and frisk was without probable cause (SR 295, 384), and that trial counsel was ineffective

for failing to inform the court that Petitioner wanted to proceed *pro se* (SR 306-08, 323-38).  The

trial court (in the last-reasoned state court decision) denied both of those claims on the merits.

(SR 428-38; *see also* Background, *supra*, at Section C(5).)  Further, Petitioner sought leave to

appeal to the Appellate Division (on all issues raised in his Section 440.10 motion) (SR 440-63),

thereby satisfying the exhaustion requirement.  *Reyes v. Phillips*, No. 02cv7319 (LBS), 2005 WL

2173812, at *4 (S.D.N.Y. Sept. 6, 2005) ("in order to properly exhaust claims raised in an

unsuccessful § 440.10 motion, a habeas petitioner must seek leave to appeal the denial of the

motion to the Appellate Division.").  Thus, to the extent that the claims in the Petition are the

same as those raised in Petitioner's Section 440.10 motion, they are subject to review under

AEDPA.

The trial court's denial of these claims was not an unreasonable application of *Strickland*.

The court was correct that, based on the record before it, Petitioner's claims about his counsel's

failure to investigate, and about Petitioner's desire to proceed *pro se*, were entirely conclusory.

The court aptly noted that Petitioner did not allege where the "footage from an unknown

additional video camera came from," nor did he "allege what the camera would have shown." (SR 432-33.)  Additionally, the court reasonably found that, as the Appellate Division had previously concluded that the officers had reasonable suspicion to stop and frisk Petitioner, Petitioner's claim that a camera would show something different was "conclusory."  (SR 433 (citing *Reyes*, 122 A.D.3d at 466).)  The court further found – and the record does not refute – that Petitioner had "never unequivocally" stated that he "wanted to represent himself."  (SR 434.) For these reasons, Petitioner has not established that his counsel's performance was deficient, as necessary to satisfy the first prong of *Strickland*.

As to any remaining portions of this first stated ground for habeas relief (including Petitioner's reference to his counsel's supposed failure to "mention[] subject matter jurisdiction" to the trial court), Petitioner's allegations are simply too vague to state a viable habeas claim. *See, e.g., Jones v. Poole*, No. 06cv7172 (NRB), 2007 WL 2456646, at *11 (S.D.N.Y. Aug. 21, 2007) ("vague and conclusory claims are not sufficient bases for habeas corpus relief.") Accordingly, I recommend that the entirety of Petitioner's first stated claim be dismissed as meritless, under AEDPA.

> **b.    Trial Counsel's Alleged Failure To Object To Evidence Introduced at the Suppression Hearing (Ground Two)**

Petitioner next alleges that his trial counsel was ineffective because he "failed to object to evidence introduced at [the] suppression hearing and pictures of [Petitioner]," despite the fact that Petitioner allegedly "was walking on the street [and] stopped and arrested without probable cause."  (Pet., at 8 ¶ 12(a) (Ground Two).)  As noted above, Petitioner does not specify the "evidence" or the "pictures" to which he is referring, but, liberally construed, his reference to the "evidence" may refer to the physical evidence taken from him after he was stopped and arrested (including the drill bit, the duffel bag containing stolen property, and the lock picks), and his

reference to the "pictures" may relate to the images on the surveillance video, and the still image taken from that video and placed on the wanted poster.  It also appears that Petitioner may be contending that his counsel should have objected to the introduction, at trial, of both the physical evidence recovered from him, as well as his identification from the video or wanted poster, on the ground that the stop and frisk was unlawful.  (*See id.*)

Petitioner asserts that he raised this claim before the state courts on his direct appeal. (Pet., at 8 ¶ 12(c).)  While Petitioner did raise a Fourth Amendment violation on direct appeal, asserting that the evidence derived from the stop and frisk – specifically the drill bit and the contents of the duffel bag – should have been suppressed because the officers did not have "reasonable suspicion" to stop and frisk him (Pet. App. Mem., at SR 33-41), Petitioner did not raise an *ineffective-assistance-of-counsel* claim based on his trial counsel's alleged failure to object to the prosecution's use of this evidence against him (*see generally id.*).

The only portion of this ineffective-assistance claim that Petitioner exhausted is his contention that his counsel was ineffective for failing to object to his identification from the video and wanted poster.  Petitioner raised this claim in his Section 440.10 motion (SR 354-65); it was denied by the trial court on the merits (in the last-reasoned decision of the state courts) (SR 428-39; *see also* Background, *supra*, at Section C(5)); and Petitioner exhausted the claim by seeking leave to appeal to the Appellate Division on all issues raised in the 440.10 motion (SR 440-62).  Therefore, to the extent Petitioner is raising this claim in his Petition, it is reviewable under AEDPA.

The trial court's rejection of this part of Petitioner's claim was not an unreasonable application of *Strickland*, especially in light of the Appellate Division's finding, on direct appeal, that the police had reasonable suspicion that justified the stop and frisk – a factual finding that,

absent clear and convincing evidence to the contrary must be presumed correct under AEDPA.

(*See supra*, at n.22; *see also* 28 U.S.C. § 2254(e)(1); *Curry v. Burge*, No. 03cv0901 (LAK)

(AJP), 2004 WL 2601681, at *10 (S.D.N.Y. Nov. 17, 2004) ("AEDPA provides a deferential

review standard for state court factual determinations:  a determination of a factual issue made

by a State court shall be presumed to be correct." (internal quotation marks and citation

omitted)).  As Petitioner has not introduced any evidence, much less clear and convincing

evidence, to challenge that factual finding, he cannot prevail on this aspect of his ineffective-

assistance claim.

  As Petitioner did not exhaust his claim that his trial counsel was ineffective for failing to

object to the introduction of evidence recovered from his person, and as he could have raised that

claim on direct appeal but did not, that claim must be deemed exhausted and procedurally barred.

*See Grey*, 933 F.2d at 120-21.  Petitioner cannot overcome the bar, as he has shown neither cause

and prejudice for his procedural default, or that our failure to review the claim would result in a

fundamental miscarriage of justice (*i.e.*, he has not presented new evidence of actual innocence).

*See Coleman*, 501 U.S. at 749-50; *Schlup*, 513 U.S. at 321.  Yet, regardless of the procedural bar,

Petitioner could not, in any event, prevail on his unexhausted claim, for the same reason that he

cannot prevail on his exhausted claim that his counsel was allegedly ineffective for failing to

object to the identification evidence.  The only reason given by Petitioner as to why his trial

counsel was purportedly ineffective for failing to object to *any* of the cited evidence is that,

according to Petitioner, the evidence was the product of an unconstitutional stop-and-frisk.  The

factual finding of the state court that undermines that argument undermines, equally, all of the

ineffective-assistance claims that Petitioner raises as his second ground for habeas relief.

  I therefore recommend that Petitioner's second stated claim be dismissed in its entirety.

      **c.**      **Trial Counsel's Alleged Failure To Challenge Petitioner's**
                   **Prior Convictions, in Connection With His Adjudication**
                   <u>**as a Persistent Violent Felony Offender (Ground Four)**</u>

Petitioner claims that his trial counsel was ineffective for failing to challenge Petitioner's

prior convictions in the context of the persistent violent felony offender adjudication.  Petitioner

asserts that he raised this claim both on his direct appeal (Pet., at 11 ¶ 12(c)) and in his

Section 440.20 motion (*id*. ¶ 12(d)).  Petitioner did not, in fact, raise this claim on direct appeal,

but he did raise it in his Section 440.20 motion.  (*See* SR 147-59.)  The trial court denied

Petitioner's motion (SR 255-62), and Petitioner sought leave to appeal (SR 263-85), thereby

exhausting this claim.[23]  In the trial court's decision on the Section 440.20 motion, the court

rejected the claim on the merits, holding that the challenge would have been frivolous under state

law (because a finding that a defendant is a second violent felony offender is binding in any

future proceeding), and that it is not ineffective assistance to fail to raise a frivolous claim.  (SR

258-59.)

The trial court's rejection of the claim cannot be found to have been an unreasonable

application of *Strickland*, as Petitioner has not shown that his counsel would, in fact, have had a

non-frivolous basis for challenging his prior convictions, the resulting second-violent-felony-

offender adjudication, or its effect on his later sentencing, and "the failure to file frivolous

motions cannot constitute ineffective assistance of counsel."  *Feliciano v. United States*,

No. 01cv9398 (PKL), 2004 WL 1781005, at \*5 (S.D.N.Y. Aug. 10, 2004).  Accordingly, this

claim should also be dismissed.

---

      [23] This Court notes that Petitioner sought to raise this same claim again in his
Section 440.10 motion, but that does not affect this analysis, as it had already been raised in the
Section 440.20 motion, and denied on the merits there, which makes the claim reviewable under
AEDPA.  In any event, in ruling on Petitioner's claim in the context of his Section 440.10
motion, the trial court adhered to its earlier decision.

>    **2.    Ineffective-Assistance-of-Appellate-Counsel Claim:**
>          **The Alleged Failure To Raise, on Appeal,**
>          **a Due-Process Claim Regarding the Trial Court's**
>          **Improper Response to a Juror's Question (Ground Three)**

A claim for ineffective assistance of appellate counsel "is evaluated upon the same

standard as is a claim of ineffective assistance of trial counsel." *Mayo v. Henderson*, 13 F.3d

528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)).  To

establish that appellate counsel was constitutionally "ineffective," Petitioner must show that

(1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on

appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that

defendant's appeal would have been successful before the state's highest court.  *See, e.g.*, *Smith*

*v. Robbins*, 528 U.S. 259, 285 (2000); *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001).

Appellate counsel does not have a duty to advance every available non-frivolous argument on

appeal.  *See Jones v. Barnes*, 463 U.S. 745, 754 (1983).  This is because "[e]xperienced

advocates since time beyond memory have emphasized the importance of winnowing out weaker

arguments on appeal and focusing on one central issue if possible, or at most a few key issues."

*Id.*, 463 U.S. at 751-52.  A petitioner, however, can demonstrate that appellate counsel was

constitutionally ineffective, where he "shows that counsel omitted significant and obvious issues

while pursuing issues that were clearly and significantly weaker."  *Mayo*, 13 F.3d at 533.

Petitioner's final stated ground for habeas relief is that his appellate counsel was

ineffective for failing to raise, on direct appeal, a due-process claim that the trial court

improperly responded to a juror's question, by answering the question without first consulting

with counsel.  (Pet., at 9 ¶ 12(a).)  Specifically, Petitioner claims that his appellate counsel

should have raised the fact that a juror asked a question in open court and that the trial judge

immediately responded, without asking the jury to submit a note or first giving counsel the

opportunity to be heard.  (*See id.*)  While Petitioner does not specify, in the Petition, the juror

question with which he takes issue, only one possibility exists on the record before the Court –

the question posed by a juror as to what the court meant by "in the fifth degree."  (*See* Trial Tr.,

at 470.)

Petitioner says that he raised this claim before the state courts both through his direct

appeal (Pet., at 10 ¶ 12(c)) and in a *coram nobis* application (*id*. ¶ 12(d)).  While Petitioner did

not actually raise this claim on direct appeal, he did raise it in his March 2015 *coram nobis*

application.  (SR 117-19.)  As set out above, the Appellate Division denied his claim without

opinion*, see Reyes*, 2015 N.Y. App. Div. LEXIS 9791, *1, and Petitioner sought leave to appeal

to the Court of Appeals from the denial of that application (SR 143), exhausting the claim for

purposes of habeas review.  As the decision of the Appellate Division did not expressly state that

the claim was denied due to a state procedural bar, this Court must presume that the claim was

denied on the merits, rendering it reviewable under AEDPA.  *Jiminez v. Walker*, 458 F.3d 130,

145–46 (2d Cir. 2006), *cert. denied*, 549 U.S. 1133 (2007); *accord Wesley v. Ercole*, No. 9:06-

CV-01118-JKS, 2009 WL 2601242, at *4 (N.D.N.Y. Aug. 20, 2009) ("because it is not clear

from the record that the state court did not decide the case based upon the merits, the Court

assumes that the state court decided the claim on the merits and . . . . [t]his Court gives the

assumed decision of the state court the same AEDPA deference that it would give a reasoned

decision of the state court.").

To have made out a claim that judicial error at trial resulted in a due-process violation,

Petitioner would have needed to show that the error was so serious that the trial was rendered

fundamentally unfair.  *See Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993); *Allaway v.*

*McGinnis*, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004).  In this instance, the trial court

acknowledged that it had not consulted with counsel prior to answering the juror's question, and asked both parties' counsel if either had a problem with the instruction that was given, or wished for the court to give a different explanation or to bring the jury back for any clarification.  (*See* SR 128-29.)  Both counsel declined.  (*See* SR 129.)  Furthermore, the response given by the court to the jury was not defective.

The People argued in opposition to Petitioner's *coram nobis* application that the juror question at issue was "ministerial or non-substantive" because it "was unrelated to the elements on which the jurors had to deliberate and, thus, there [was] no way that the court's response could have affected deliberations" and it "in no way impacted [Petitioner's] 'opportunity to defend against the charges.'"  (SR 135-36 (citing *People v. Hameed*, 88 N.Y.2d 232, 241 (1996)).)  This Court agrees.  As the trial court's response to the question did not impact Petitioner's opportunity to defend against the charges, Petitioner's trial was not rendered fundamentally unfair by the court's actions; thus, he could not have made out a viable due-process claim, and appellate counsel's failure to raise such a claim could not have constituted ineffective assistance.

This is particularly so considering that appellate counsel is not required to advance every possible argument, but may narrow down the possible claims to present on appeal, so as to proceed with those that are considered the strongest.  *See Jones v. Barnes*, 463 U.S. 745, 754 (1983).  This was hardly a stronger claim that those that were presented on appeal.  Thus, it was a reasonable application of *Strickland* for the Appellate Division to have rejected the ineffective-assistance claim, on *coram nobis*, and I recommend that Petitioner's ineffective-assistance-of-appellate-counsel claim be dismissed.

**CONCLUSION**

For all of the foregoing reasons, I respectfully recommend that Petitioner's Petition for a Writ of Habeas Corpus (Dkt. 2) be dismissed in its entirety.  Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A) because Petitioner has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail).  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Katherine Polk Failla, United States Courthouse, 40 Foley Square, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Failla.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Petitioner does not have access to cases cited herein that are reported only on Westlaw, he may request copies from Respondent's counsel.  *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

The Clerk of Court is directed to mail a copy of this Report and Recommendation to

Petitioner at the address reflected on the Docket and shown below.

Dated:  New York, New York
        February 4, 2022

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Mr. Teofilo Reyes
DIN No. 12-A-0658
Downstate Correctional Facility
Box F
Red Schoolhouse Rd.
Fishkill, NY 12524

Respondent's counsel (via ECF)